**UNITED STATES of America**
Plaintiff,

v.

**Eqbal AHMAD, Philip Berrigan, Elizabeth McAlister, et al., Defendants.[1]**

**Crim. No. 14950.**

United States District Court,
M. D. Pennsylvania.

Aug. 25, 1972.

As Amended Sept. 5, 1972.

See also 335 F.Supp. 1198.

---

[1]. Defendants Berrigan and McAlister, along with six others, were also indicted and tried on charges of conspiracy to kidnap, and conspiracy to destroy government property. One of the original eight defendants, John Theodore Glick, was severed before trial. Glick was also charged on the conspiracy count but has not yet been tried. The jury was unable to reach agreement on the conspiracy counts.

Additionally, defendants Berrigan, McAlister, and Ahmad were indicted on charges of using the mails to threaten the life of Presidential Advisor Henry Kissinger, the alleged kidnap victim. The court directed a verdict of acquittal on the threat count as to Ahmad. The jury was unable to reach a verdict on that count as to Berrigan and McAlister. The only resulting convictions in the 10-count indictment were the seven smuggling charges in the instant post trial motions.

914

**916**

William S. Lynch, Deputy Asst. Atty. Gen., Internal Security Div., U. S. Dept. of Justice, Washington, D. C., S. John Cottone, U. S. Atty., Scranton, Pa., William Connelly, Paul J. Killion, J. Philip Krajewski, Sp. Attys., U. S. Dept. of Justice, Washington, D. C., for United States.

Ramsey Clark, R. Stan Mortenson, Kenneth C. Bass, III, Paul, Weiss, Rifkind, Wharton & Garrison, Terry F. Lenzner, Washington, D. C., William C. Cunningham, S. J., William J. Bender, New York City, J. Thomas Menaker, McNees, Wallace & Nurick, Harrisburg, Pa., for defendants.

## MEMORANDUM OPINION

HERMAN, District Judge.,

Before this court are two post trial motions submitted by defendants Philip Berrigan, a Roman Catholic priest, and Sister Elizabeth McAlister, a nun. Philip Berrigan was convicted on four counts of violating 18 U.S.C. § 1791; Elizabeth McAlister was convicted on three counts of violating the same statute. The so-called "contraband" statute[2] essentially prohibits the smuggling into or out of a federal prison any item without the "knowledge and consent"[3] of the war-

---

2. 18 U.S.C. § 1791: Traffic in contraband articles provides: "Whoever, contrary to any rule or regulation promulgated by the Attorney General, introduces or attempts to introduce into or upon the grounds of any Federal penal or correctional institution or takes or attempts to take or send therefrom anything whatsoever, shall be imprisoned not more than ten years."

3. 28 C.F.R. Chapter 1, Part 6—Traffic in contraband articles in Federal penal and correctional institutions § 6.1 provides: "The introduction or attempt to introduce into or upon the grounds of any Federal penal or correctional institution or the taking or attempt to take or send therefrom anything whatsoever without the knowledge and consent of the warden or superintendent of such Federal penal or correctional institution is prohibited."

den. Each of the separate convictions involved letters beween the defendants. Berrigan, an inmate at the Lewisburg Federal Prison, Lewisburg, Pennsylvania, was convicted of causing one letter to be smuggled out of the prison to Elizabeth McAlister. He was also convicted on three counts of attempting to send letters out of the prison on separate occasions. Sister McAlister was convicted on three counts of attempting to smuggle three letters into the prison. Each of the seven letters was carried by the same courier: one Boyd F. Douglas, Jr. Douglas, also an inmate at Lewisburg, was both a confidant of the defendants and, ultimately, an informer for the Federal Bureau of Investigation.

The government contended at trial that the letter smuggling began after prison officials removed Sister McAlister from Berrigan's list of approved correspondents. The system apparently used Boyd Douglas as a direct courier for Berrigan's letters out of prison. Douglas was on a study-release status studying days at a nearby university and sleeping nights at the prison. Douglas admitted on the witness stand that he had kept an apartment near the university campus, contrary to prison regulations. The informant would take the letters directly from Berrigan, hide them in his school notebook and remove them from the prison. Once on campus, according to Douglas, he would use a photocopy machine to duplicate Berrigan's letters to McAlister. Douglas would then send the original on to a mailing address where McAlister could retrieve it. Defendant McAlister used the addresses of other nuns and on occasion the rectory of Saint Gregory's Church in New York City. In return, McAlister would mail her letters to Douglas's unauthorized Lewisburg apartment. Douglas would then copy her letter into his notebook (on occasion the copying was done by coeds whom Douglas knew). He would then take the notebook into the prison and retain the original.

Defendants have submitted motions in arrest of judgment and for acquittal. The motion in arrest of judgment renews a defense pre-trial motion challenging the constitutionality of 18 U.S.C. § 1791; contending that the statute is overbroad, vague, and an improper delegation of authority.

The motion for judgment of acquittal sets forth the following contentions:

(a) The evidence does not support the verdicts in that the warden knew of the alleged smuggling;

(b) The court's charge to the jury improperly defined the statute;

(c) The defendants were entrapped as a matter of law;

(d) The government discriminatorily prosecuted the defendants and the court improperly denied the defendants the right to obtain and introduce evidence of such discrimination; and

(e) The court improperly refused to order the government to grant immunity to defense witnesses.

In this opinion the court also deals with the defense contention, originally presented in a motion to dismiss the indictment that the government's evidence was the product of illegal electronic surveillance.

## I. MOTION IN ARREST OF JUDGMENT

Defendants first challenged the constitutionality of 18 U.S.C. § 1791 in a pre-trial motion for dismissal. This court rejected the defense argument in an order unaccompanied by an opinion. Although nothing has occurred to alter the court's conclusion, an explanation is in order.

As is often the case in such a complex problem, there is a dearth of judicial scrutiny of 18 U.S.C. § 1791. Needless to say, the United States Supreme Court has never directly passed on the matter, despite the statute's nearly quarter-century of existence. United States v. Ruckman, 169 F.Supp. 160 (S. D.W.Va.1959) was apparently the first direct challenge to the statute and its attendant regulations. In that case the

defendant was convicted of smuggling food into a federal prison. Despite the relatively innocuous nature of the "contraband" the court rejected defendant's arguments and ruled the statute to be a constitutional delegation of authority.[4]

Ruckman has been supported by the only other cases to have considered the problem. United States v. White, 295 F.Supp. 893 (N.D.Ga.1968); Fulwood v. Alexander, 267 F.Supp. 92 (M.D.Pa. 1967); and Carter v. United States, 333 F.2d 354 (10th Cir. 1964).

Carter also involved the unauthorized introduction of food: five jars of instant coffee. It eventuated that the jars actually contained ordinary dirt. Defendant Carter was convicted of conspiracy to violate the statute, and the Tenth Circuit upheld the conviction, the court concluding that Congress may attach a criminal penalty to an administrative rule which it may constitutionally delegate. United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911) was cited with approval in Carter. In Grimaud, in reversing demurrers to the evidence in a criminal case in which defendants were charged with the violation of a regulation of the Secretary of Agriculture, the Supreme Court in speaking of the party making the regulation said, at 518, 31 S.Ct. at 483:

> "They did not go outside of the circle of that which the act itself had affirmatively required to be done, or treated as unlawful if done. But confining themselves within the field covered by the statute they could adopt regulations of the nature they had thus been generally authorized to make, in order to administer the law and carry the statute into effect."

In Fulwood, *supra*, the late Judge Follmer, sitting in this district, affirmed the delegation of power in § 1791. The court also upheld the right of the warden to confiscate a Muslim newspaper and to partially proscribe religious practices that interfered with prison order and routine.

Defendants concede the case law to be limited and against their position but contend that the above cases go only to the issue of congressional authorization. Father Berrigan and Sister McAlister argue that the crucial issue is the granting of the "unfettered discretion" to the warden. Contrary to defendants' assertion, the limited case law does involve the regulation in question. In each instance the contraband was not specified

4. Of assistance in interpreting the statute in question are, 18 U.S.C. § 4001 and 28 C.F.R., Chapter 1, Subpart Q, §§ 0.95, 0.97:

18 U.S.C. § 4001 provides: "The control and management of the Federal penal and correctional institutions, except military or naval institutions, shall be vested in the Attorney General, who shall promulgate rules for the government thereof, and appoint all necessary officers and employees in accordance with the civil-service laws, the Classification Act, as amended and the applicable regulations.

"The Attorney General may establish and conduct industries, farms, and other activities and classify the inmates; and provide for their proper government, discipline, treatment, care, rehabilitation, and reformation."

28 C.F.R. Chapter 1, Subpart Q, § 0.95 provides: "Subject to the general supervision and direction of the Attorney General, the Director of the Bureau of Prisons shall direct all activities of the Bureau of Prisons, including:

"(a) Management and regulation of all Federal penal and correctional institutions (except military or naval institutions), and prison commissaries.

"(b) Provision of suitable quarters for, and safekeeping, care, and subsistence of, all persons charged with or convicted of offenses against the United States or held as witnesses or otherwise.

"(c) Provision for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.

"(d) Classification, commitment control, or treatment of persons committed to the custody of the Attorney General."

Section 0.97, Redelegation of Authority, provides: "The Director of the Bureau of Prisons is authorized to redelegate to any of his subordinates any of the authority, functions, or duties vested in him by this Subpart Q. Existing redelegations by the Director of the Bureau of Prisons shall continue in force and effect until modified or revoked."

in the statute or regulations, but drawn into the ambit of § 1791 by the "anything whatsoever" concept of 28 C.F.R. Chapter 1, Part 6. Defendants cite White as casting doubt on the breadth of the delegation as set down in the regulations. However, the court in White looked squarely to the Tenth Circuit's Carter decision and denied the defendant's appeal. What the defendants in the instant case point to can only be described as pure dicta in the footnotes.

Defendants also argue that the statute is both overbroad and vague. As to the issue of vagueness, defendants assert that inmates cannot possibly know what is forbidden from being sent out of the prison. Likewise, potential visitors, etc. cannot know what is forbidden from importation. In reality, the regulation makes quite clear that "anything whatsoever" is forbidden as contraband unless the warden gives his consent. While such language may appear overbroad, the *breadth* of the language is not sufficient to attack its *specificity*.

This court finds an analogous case compelling in rejection of the defendants' breadth and first amendment arguments. In United States v. Flower, 452 F.2d 80 (5 Cir. 1971), a military compound had a similar regulation giving equivalent authority to the post commander as that given to the warden. Regulation 210–6, promulgated under authority of 18 U.S.C. § 1382, was the subject of an appeal closely aligned to the problem presented by this case. Appellant, the Peace Education Secretary of the American Friends Service Committee, was convicted for distributing leaflets. The Fifth Circuit affirmed the conviction. The court said nothing in its decision condoned "unfettered discretion," but that broad powers were necessary for effective control of such an institution. The court indicated that the proper remedy was not an attack on the power of the Commandant, but on whether he abused the discretion granted to him. Second, the court drew an important distinction between closed institutions and everyday activities:

"To acquiesce in appellant's claim that both the statute and the regulation are unconstitutional we would have to accept his contention that there is no difference between public streets, public roads, towns, shopping centers, and public parks on one hand and military reservations under the exclusive jurisdiction of the federal government on the other. We would have to agree all are one and the same and that the exercise of First Amendment rights at all of these places is governed by the same standards. This we cannot do." . . . .

■ A letter is essentially neutral, made dangerous or innocuous by its author. Given the potential of a letter—to transmit escape plans, etc.—the warden must know of its contents before passing judgment on its suitability for importation into or exportation from the prison.

As Mr. Chief Justice Warren noted, in United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968):

"This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and *if the incidental restriction on the alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest*." . . .
(Emphasis added)

**920**

This court concludes that 18 U.S.C. § 1791 meets each of the requisites set down in O'Brien. In light of the cases noted *supra,* interpreting § 1791, the Congress constitutionally delegated the authority in question. The interest involved is an "important and substantial" one [5] and unrelated to the suppression of free speech. By definition there is a distinction between "incidental limitations" on speech and its suppression. This statute and case present examples of an incidental limitation, at most, and a limitation no greater than that absolutely required for the furtherance of safe and efficient prison maintenance. This court, therefore, rejects defendants' attack on the constitutionality of 18 U.S.C. § 1791.

## II. MOTION FOR A JUDGMENT OF ACQUITTAL

### (a) The evidence does not support the verdicts.

Defendants argue that no crime was committed relative to 18 U.S.C. § 1791 since the warden (or assistant warden) knew of the letter smuggling and impliedly consented to it by failing to intervene. The defendants accurately quote § 1791 as requiring the act to be done or attempted "without the knowledge and consent" of the warden. The crucial question is the balance between *mens rea* in the crime and the knowledge elements as a requisite to the occurrence of the crime.

The defendants contend that the congressional intent of the statute was to assure the warden maximum knowledge of activities within the prison, thereby making management of the prison a feasible task. The defense reasons that if the warden knows of the smuggling, the purpose of the act is satisfied and no crime can exist.

■ Such an interpretation of the statute is unjustified and inaccurate. The statute expressly makes it a crime to attempt to secrete contraband without the knowledge and consent of the warden. The intent of the parties to bypass prison channels and smuggle the letters, combined with action toward that goal is sufficient to complete a punishable offense.

■ This court feels that the gist of § 1791 was to punish the attempted or completed act of smuggling contraband into or out of a federal prison. The intent of the party committing the offense to deprive the warden of knowledge of such smuggling seems to this court to be the gravamen of the offense.[6]

■ It was established at trial through the testimony of Boyd F. Douglas that in each instance Berrigan turned over an envelope or letter, etc. to Douglas inside the prison walls. (The defendants presented no defense whatever, and therefore Douglas's testimony was uncontroverted.) It is essential to note that it would have been physically impossible for either Berrigan or McAlister to secrete any contraband into or out of the prison. Berrigan was not permitted

---

5. In Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971), the court, alluding to O'Brien, referred to prison security as just such an "important and substantial" interest.

6. *See,* New York Penal Law, McKinney's Consol.Laws c. 40, § 110.10; United States v. Thomas, 13 U.S.C.M.A. 278, 32 C.M.R. 279 (1962); Hall, General Principles of Criminal Law, 2d ed., at 586 (1960); Perkins, Criminal Law, 489 (1957); Model Penal Code, Art. 5, § 501:
 "(1) *Definition of attempt.* A person is guilty of an attempt to commit a crime if acting with the kind of culpability otherwise required for commission of the crime he:
 "(a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or
 "(b) when causing a particular result is an element of the crime, does or omits to do anything with the belief that it will cause such result, without further conduct on his part; or
 "(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is a substantial step in the course of conduct planned to culminate in his commission of the crime."

to leave and McAlister had been stricken from the visitor's list as well as correspondence list. Because of the obvious physical limitations, the defendants were unable to fully complete a smuggling. In short, they each did as much as they could toward establishing clandestine correspondence. They wrote long, detailed letters to each other, sealed them, and saw to it that their courier obtained possession of them. It is obvious from a reading of the record that the defendants not only completed a violation of the crime by their own acts, but completed all the essential elements of an attempt prior to using the services of Boyd Douglas.

A rational reading of the record shows clearly that neither the warden nor his assistant was present on any of the occasions when Berrigan surrendered custody of the letters to his courier Douglas. At that instant defendant Berrigan committed a punishable offense. At that instant Berrigan *attempted* to secrete the contraband through his only non-official source. Defendant Berrigan's intent to withhold knowledge of the letter from the warden can be found in the record sufficiently for the jury to have convicted him. Likewise, the warden *actually* was unaware of the transfer of the letter from Berrigan to Douglas (and consequently unable to consent). Therefore, the defendant completed a punishable offense which the jury could have found from evidence adduced at trial.

■ As to Berrigan's conviction on Count IV, the defense arguments on knowledge and consent are irrelevant. Count IV is the count which alleges a completed smuggling. The remaining counts allege attempts. Douglas's direct testimony, supported by Assistant Warden Hendricks, indicates clearly that Berrigan delivered a letter to Douglas which he carried to McAlister (Transcript, Vol. 6, pp. 152, 170, 172). Absolutely no evidence was elicited at trial that would establish that the warden knew or consented to the action. On the contrary, Hendricks' testimony expressly shows that he never knew of the letter in Count

IV until after completion of the smuggling (Transcript, Vol. 4, p. 151). Therefore, as to Count IV, evidence clearly existed sufficient to support a conviction.

■ An examination of Sister McAlister's activities also supports convictions under § 1791. The record reveals sufficient evidence for the jury to have found actual intent on her part to pass the three letters through Douglas to Berrigan without informing the warden. This is borne out in light of her removal from Berrigan's official mailing list at the prison (necessitating clandestine correspondence or none at all). Also, the evidence taken as a whole, reveals that the warden was certainly absent when Sister McAlister first posted her letters in the mail box. Those letters, according to Douglas, were mailed to his apartment near the college campus, outside the prison. Even Douglas was unaware of specific letters until their actual arrival at his Lewisburg apartment. His testimony reveals that the warden was not present when Douglas retrieved the letters at the apartment and had them copied into his notebooks. In short, the warden was actually unaware of the specific letters at the point in time when defendant McAlister first *attempted* to begin smuggling. (Regardless of whether the beginning point is her posting of a letter in the federal mails or the receipt of a letter by Douglas.)

■ Defendant McAlister also asserts that even assuming the requisite intent, etc., she cannot be guilty of the smugglings since Douglas would transcribe the letters into a notebook. In effect, McAlister's part ended in Douglas's apartment when her original letters were rerouted, according to the defendant's argument. Nevertheless, this court feels that defendant McAlister's *attempt* to violate 18 U.S.C. § 1791 was complete and can be supported by the record regardless of Douglas's intervention. This conclusion is bolstered by the fact that McAlister and Douglas met and discussed a variety of methods for secreting letters and/or messages (sometimes oral) into the prison. Additionally, Sister

McAlister's letters to Berrigan contained a salutation in his name and detailed information, often running to several pages. When defendant McAlister wrote the letters involved, she did not know the precise method by which they would make their way to Berrigan. The mere fact that her courier transcribed the detailed letters (verbatim) does not alter the fact that she had already attempted to violate 18 U.S.C. § 1791, and completed the offense. Her attempt was in giving the letters to Douglas and intending that they be passed to Berrigan without the knowledge and consent of the warden.

The court therefore rejects the argument that the weight of the evidence does not support the jury's verdict.

## II. (b) Jury Charge.

A part of the defendants' argument regarding the weight of the evidence is their contention that the court's charge to the jury was incorrect.[7]

7. Transcript, Vol. 29, pp. 70–73:

"Count IV additionally charges Philip Berrigan with a violation of 18 U.S.C., Section 2, which I just read to you in connection with one of the other offenses. That is the aiding or abetting or causing to be done [of] some act.

"These charges, of course, concern the letters which were put in evidence as government exhibits and which will go out with you to the jury room.

"Title 18 of the United States Code, Section 1791, makes it unlawful to introduce or attempt to introduce into or upon the grounds of any federal penal or correctional institution or take or attempt to take or send therefrom anything whatsoever, contrary to any rule or regulation promulgated vy [sic] the Attorney General.

"And Section 2, I did tell you, I read before.

"Title 28 of the Code of Federal Regulations, Part 6, Section 6.1 was promulgated pursuant to this Title 18, United States Code, Section 1791, and provides that:

"'The introduction or attempt to introduce into or upon the grounds of any federal penal or correctional institution, or the taking or attempt to take or send therefrom anything whatsoever without the knowledge and consent of the warden or superintendent of such federal penal or correctional institution is prohibited.'

"Now, the defendants argue that the government has not proved beyond a reasonable doubt that the warden or superintendent had no knowledge or that he had consented to this passing of letters back and forth.

"The government contends that as to the first letter from Berrigan, which is Count IV, the testimony shows that no one in authority at the prison knew of this and that as to the rest only an attempt to introduce is alleged and that this was shown.

"Here, as in all of the counts, if you have a reasonable doubt you will acquit and if you have no reasonable doubt then you will convict.

"The Warden of the United States Penitentiary has declared as unauthorized and contraband items not issued by the institution, not purchased through the commissary, or not authorized in writing for possession by inmates.

"The letters which are the subjects of Counts IV through X were not issued by the institution, not purchased through the commissary and were not authorized in writing for possession by Philip Berrigan and are therefore contraband.

"To 'attempt' an offense means willfully to do some act in an effort to bring about or accomplish something the law forbids to be done. An act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids.

"If you find beyond a reasonable doubt that the defendant Philip Berrigan caused a letter to be sent to Elizabeth McAlister without the knowledge and consent of the Warden of Lewisburg Penitentiary, then you may find him guilty on Count IV.

"If you have a reasonable doubt that the letter described in Count IV was caused to be sent without the knowledge and consent of the Warden, then you should find the defendant Philip Berrigan not guilty as to Count IV.

"If you find beyond a reasonable doubt that the defendant Philip Berrigan attempted to send letters to Elizabeth McAlister without the knowledge and consent of the Warden of Lewisburg Penitentiary, then you may find Philip Berrigan guilty on Counts VI, VIII and X.

"If you find beyond a reasonable doubt that the defendant Elizabeth McAlister attempted to introduce letters into Lewisburg Penitentiary without the Warden's knowledge and consent, then you may find Elizabeth McAlister guilty on Counts V, VII and IX.

"But if you have a reasonable doubt in any of these counts that the letters were attempted to be sent out of the peni-

At the outset it bears noting that a careful re-reading of the charge as a whole and the portion under attack reveals no prejudice whatever to defendants. Defendants contend that the charge "omits any consideration of the essential element of transportation out of a federal penal or correctional institution." The defense brief also contends that "the jury was not required to find that the subject letters passed out of Lewisburg Penitentiary." (Defense brief in support of motion for acquittal, at 14.)

■ Regardless of which interpretation one places on the statute, the defense contentions are erroneous and irrelevant. It is wholly unnecessary and inaccurate to charge a jury that contraband need pass into or out of a prison to violate 18 U.S.C. § 1791; 28 C.F.R. Chapter 1, Part 6. The law expressly makes the attempt a crime. As this court noted, the intent to circumvent ordinary prison channels without the warden's permission, combined with conduct is sufficient. Neither transportation nor success in the endeavor is required. To argue otherwise would be a gross distortion of the statute.

■ The defendants also contend that the court incorrectly instructed the jury regarding "knowledge and consent" in relation to the statute.[8] The defense contends that the court's charge left the jury "free to speculate and adopt its own theory of the law relevant to this crime." Initially, it should be noted that the court's instructions were referring to factual disputes between the defense and government. The court merely took note that the defendants felt the warden knew about the smuggling and that the government contended the knowledge to be irrelevant. As noted, success in hiding the smuggling is irrelevant. An attempt to hide the smuggling (i. e., avoid the warden's knowledge and permission) completes the crime. The crucial issue before the jury was whether the defendants were intentionally trying to conceal their correspondence from the warden. Any other interpretation of the statute would allow the court to ignore the express congressional creation of attempt. Any elaboration regarding knowledge would have belabored the obvious. There simply was no "theory" to be adopted except that revealed by the court to the jury.[9]

tentiary or into the penitentiary without the Warden's knowledge or consent, then as to that count of which you have such reasonable doubt you may find the defendant named therein not guilty.

"I don't know whether I read this or not, but if I didn't I am going to. If you find beyond a reasonable doubt that the defendant Philip Berrigan attempted to send letters to Elizabeth McAlister without the knowledge and consent of the Warden of Lewisburg Penitentiary, then you may find Philip Berrigan guilty on Counts VI, VIII and X.

"If you find beyond a reasonable doubt that the defendant Elizabeth McAlister attempted to introduce letters into Lewisburg Penitentiary without the Warden's knowledge and consent, then you will find Elizabeth McAlister guilty on Counts V, VII and IX."

8. Defendants also parenthetically allege that the court's charge as to Counts IV through X materially varied the indictment. They contend that as written the indictment precluded any convictions, while the charge virtually assured convic-

tions. The claim has no merit whatever. The indictment essentially reads, "without the knowledge and consent of the Warden of such institution, did attempt . . . . " The court's charge (See, n. 8 supra) reads, "attempted to send . . . without the knowledge and consent of the Warden . . . . " The distinction is meaningless and even if error, certainly harmless in light of the overall charge and the fact that the court read the indictment verbatim to the jury. The defense cites Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Stirone is totally inapposite since it involves a variation from the indictment which permitted the government to introduce evidence substantially different than that implied in the original indictment.

9. It requires comment that the defendants' brief frequently states that the warden "knew" of the transmission of the letters. Absolutely no evidence was elicited at trial that showed the warden knew of the smuggling as it occurred. He either learned after a particular letter was trans-

## II. (c) Entrapment.

Defendants also argue that they were entrapped as a matter of law. When entrapment is established the law accepts the defense and orders dismissal or acquittal. Defendants cite three cases to support their motion for acquittal based on entrapment: United States v. Russell, 459 F.2d 671 (9th Cir. 1972); Greene v. United States, 454 F.2d 783 (9th Cir. 1972); and United States v. Klosterman, 248 F.2d 191 (3d Cir. 1957).

The defendants find Klosterman persuasive, but this court does not. Nothing in the facts of Klosterman even remotely make it controlling in the instant case. The Third Circuit noted that predisposition is a crucial element in entrapment:

> "Whether the design is the product of official activity or of the defendant's mind is often disclosed by the amount of persuasion needed on the part of the government agent to move the defendant to the criminal conduct. Another way of stating this rule is to say that the criminal disposition of the defendant is often revealed by his response to the requests of the government agent. . . . [T]he criminal design and intent for the commission of the actual bribery originated not with him but rather with the government agents who engineered the persuasion and solicitation." (248 F. 2d, at 195)

The two key tests set out above are the "amount of persuasion" needed by the government to induce the criminal

act and the source of the "criminal design".

Clearly, the jury had sufficient evidence to conclude that Boyd Douglas was persuaded by Berrigan to act as courier and that the criminal design was Berrigan's. Logic alone would compel one to conclude that Berrigan and McAlister were seeking to reestablish their correspondence. The factual situation in Klosterman is so totally different from the instant case as to be irrelevant. The circuit's analysis in Klosterman underscores those differences:

> "In order that the solicitations . . . be within the sphere of proper law enforcement, the government must show a predisposition and criminal design . . . . This record is *devoid* of admissible evidence that would indicate to government agents that before they conceived of the plan of persuasion . . . Stafford [one of the defendants] was other than an innocent man. No previous criminal record was shown and no reputation evidence was introduced to that end." (248 F.2d, at 196) (Emphasis added)

▆▆▆ Unlike Klosterman, this record is not "devoid of" such evidence. It must be reemphasized that the Third Circuit still considers a criminal predisposition an element in entrapment cases. United States v. Clarke, 343 F.2d 90 (3d Cir. 1965). The Ninth Circuit, the source of the Greene and Russell decisions, holds a contrary view, concluding there that criminal predisposition is not crucial.[10] The Ninth Circuit's construction of the

---

mitted or *after* Douglas received the letter and *before* its transmission. At best, the warden "knew" only that letters had been exchanged and might well continue to be exchanged. All of which is totally irrelevant to the violation of the statute.

Defendants refer to the following testimony as significant on the issue of knowledge:

"Q Now, did you know that Douglas was carrying letters in and out while he was on study-release, in and out of the penitentiary, unauthorized letters?

"A [Assistant Warden Hendricks] After we intercepted the first letter, from that point on I knew that he was."

(Transcript, Vol. 5, p. 49)

&ast; &ast; &ast; &ast; &ast;

"Q And you knew after June 3rd that he was carrying letters in and out?

"A Yes sir.

"Q For Philip Berrigan and others?

"A To my knowledge, only Philip Berrigan."

(Transcript, Vol. 5, p. 52)

10. Actually the Ninth Circuit did not depart from the traditional view of entrapment in Greene, but did so in its 1972 ruling in Russell.

law of entrapment is not the law in this circuit; nevertheless, an examination of the cases may be in order.

In Greene the court applied the traditional "creative activity" standard of Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), cited with approval in Klosterman, 248 F.2d at 194, and reversed the defendants' convictions. Greene, however, is distinguishable on the facts. Defendants there were convicted of operating an illegal still, conspiracy and illegal liquor sales. The entrapment occurred through the actions of a special investigator for the IRS. The court cited six reasons for finding entrapment, reasons wholly different from anything in the instant case. First, the agent initiated contact with the defendants. Second, the events involved covered a period of two-and-one-half years. Third, the agent treated defendants as partners, offering to buy the necessary still equipment. He ultimately provided 2,000 pounds of sugar crucial to making the liquor. Fourth, the agent applied considerable pressure to defendants which the court found to be a "veiled threat". Fifth, the agent began working with defendants prior to the operation of the still and aided in its establishment. Finally, the agent was the only customer of the still he helped create.

In Russell the Ninth Circuit reversed the defendant's conviction for manufacturing, possessing, delivering and selling methamphetamine. In that case, the government itself had provided defendant with a necessary chemical ingredient. In the instant case defendants claim Douglas was just such a "necessary ingredient," notwithstanding any predisposition on their part. There is a substantial distinction between providing a vital chemical in a drug manufacture case, and being an informer where the crime may be completed by merely delivering the letter to the go-between. It is not entrapment when the government "merely afford[s] opportunity or facilities for the commission of the offense . . . ." Sorrells v. United States, *supra.*

It seems to this court that even if Russell were the law of this circuit, we could not find entrapment here as a matter of law. The intervention of Douglas did not constitute an "essential element" as defined within the context of Russell. True, no smuggling could be completed without some sort of courier system. In Russell the court decried the "intolerable degree of governmental participation in the criminal enterprise." In the context of that case, the governmental participation may well have been both intolerable and essential to the completion of the crime. But in Russell the government agent (then employed as a federal narcotics agent) approached the defendant and offered the crucial chemical needed to produce the narcotic.

In the instant case there was evidence that Berrigan first broached the subject of smuggling (Transcript, Vol. 6, p. 142). Even more important is the fact that *no* evidence points to Douglas as being a government agent or informer at the time he began his activities as the courier. Although a courier was crucial to a successful smuggling, contrasting the context of Russell and the instant case, "intolerable governmental participation" is simply absent here. Likewise, the entire question of "attempt," discussed, *supra,* substantially lessens the impact of Douglas in the activities of Berrigan and McAlister. Douglas was not an "essential element" in the completed crime of attempt.

Mr. Chief Justice Warren, in Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958), reaffirmed Sorrells, then clarified the balance between informer and provocateur:

> "Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials [citing Sorrells]. To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary

criminal." (Emphasis the Supreme Court's) ,

Defendants are asking this court to draw that line favorably to them. Based on the record as a whole we cannot do so. Nowhere in defendants' brief for acquittal does there appear a reference to any evidence pointing to entrapment. True, Boyd Douglas played a remarkably active role in the government's case. However, the testimony of Douglas (uncontroverted and certainly available for jury consideration) points away from entrapment as a matter of law. According to Douglas, Berrigan asked Douglas in late April, 1970, to smuggle out a letter, which Douglas did (Transcript, Vol. 6, p. 140).

▋ It was not until June of that same year that Assistant Warden Hendricks learned of a letter in Berrigan's cell. According to Douglas, he and Berrigan conversed in early June at which time Berrigan warned Douglas that Hendricks might suspect Douglas of smuggling (Transcript, Vol. 7, pp. 55–57). Douglas also confirmed Hendricks' testimony, saying that he (Douglas) and Hendricks discussed the letter smuggling for the first time in June, 1970 (Transcript, Vol. 7, pp. 58–60). Without further detailed examination of the evidence it is clear that Douglas began as a courier prior to becoming an FBI informer. (At least it is clear that the jury had sufficient evidence to so conclude.) The record also indicates (Transcript, Vol. 6, p. 168) that McAlister and Douglas began their acquaintance prior to June, 1970. Furthermore, entrapment is a defense only where the individual was an agent of the government. Inducement by a private citizen is not entrapment. Johnson v. United States, 115 U.S.App. D.C. 63, 317 F.2d 127 (1963); Gonzales v. United States, 251 F.2d 298 (9th Cir. 1958).

▋ The record reveals (Transcript, Vol. 6, p. 177) that Douglas was keeping the copied material in the event he was discovered by the warden; apparently in the hope of insuring against retribution. No matter how duplicitous Douglas may have been, his actions, *even if* assuming entrapment, constituted private entrapment in the early stages and therefore are not a legal defense. It is this court's conclusion that the evidence does not point to entrapment as a matter of law, nor as a matter of fact.

II. (d) Discriminatory Prosecution.

During the course of their trial, upon the cross-examination of Assistant Warden Hendricks of Lewisburg Prison, the defendants sought to introduce evidence purporting to prove the government had unconstitutionally and systematically discriminated against them in prosecuting the instant case. The court, convinced that the issue should not be submitted to the jury and uncertain as to whether the issue had been waived under Rule 12 of the Federal Rules of Criminal Procedure, refused the defendants' offer.

The question again arose in the defendants' motions for judgment of acquittal now before the court. With the leave of court, a post-trial hearing was subsequently held during which the defendants were allowed to present evidence in support of their contention. In conjunction therewith the defendants sought to subpoena records from the Department of Justice, including the prosecutor's file in the instant case. Certain materials relating to prior prosecutions under 18 U.S.C. § 1791, and retrievable from the Department of Justice files, were turned over to the defendants. These materials consisted of the Docket numbers of indictments or informations charging violations of 18 U.S.C. § 1791. The remainder of the requests contained in the defendants' subpoenas were quashed by the court upon the government's motion.[11] Subsequent thereto, the defendants requested the court to inspect *in camera* the prosecutor's file to determine if it contained memoranda reflecting alleged

---

11. Defendants argue that the court's order quashing these subpoenas was improvidently granted. This contention will be briefly discussed later in this opinion.

improper motives of the government. For the reasons which we will set forth below, we refuse to accede to the defendants' request.

 For the most part the decision to prosecute is totally within the discretion of the United States Attorney. United States v. Cox, 342 F.2d 167 (5th Cir. 1965); Dear Wing Jung v. United States, 312 F.2d 73 (9th Cir. 1962). As a corollary thereto and in compliance with the doctrine of separation of powers, the judiciary is not to become the overseer of the executive in the exercise of its discretion in the prosecution of criminal cases. See, Spillman v. United States, 413 F.2d 527 (9th Cir. 1969), cert. denied, 396 U.S. 930, 90 S.Ct. 265, 24 L.Ed.2d 228 (1969). This view toward judicial abstention was aptly expressed by Justice Burger, then Circuit Judge of the District of Columbia Court of Appeals, in Newman v. United States, 127 U.S.App.D.C. 263, 382 F.2d 479 (1967):

> "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought."

Notwithstanding this judicial reluctance to question the motives of the executive, the court is aware that the prosecution may act in such a manner in the exercise of its discretion as to be violative of due process and equal protection. It is when the prosecutor's conduct rises to the deprivation of constitutional rights that discriminatory enforcement becomes a viable defense and judicial intervention is warranted.

 The origin of the defense is found in the decision of the United States Supreme Court in the case of Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1885). There it was held:

> "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution. . . ."

As the law discriminatorily enforced in Yick Wo was an ordinance of the City of San Francisco, the action was held to have been in violation of the due process clause of the fourteenth amendment. However, it is now clear that the same type of discriminatory application when administered by the federal government is in violation of the due process clause of the fifth amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); United States v. Gebhart, 441 F.2d 1261 (6th Cir. 1971); Washington v. United States, 130 U.S. App.D.C. 374, 401 F.2d 915 (1968). The test of Yick Wo has been subsequently refined by the Supreme Court; in addition to unequal application the defendant must also prove the element of intentional and purposeful discrimination (i. e., bad faith). Boyle v. Landry, 401 U.S. 77, 81, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Edelman v. California, 344 U.S. 357, 359, 73 S.Ct. 293, 97 L.Ed. 387 (1953); Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). There may be a number of legitimate reasons why the government may choose to prosecute a defendant exclusive of the substance of the case against him. Mere failure to prosecute others similarly situated does not constitute a violation of due process or equal protection. Moss v. Hornig, 314 F.2d 89 (2d Cir. 1963). In Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), the Supreme Court held:

> "[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race,

religion or other arbitrary classification. . . . "

In essence the defendants contend that the Department of Justice has maliciously sought prosecution of these defendants not for their criminal conduct alone, but because of their opposition to the war in Viet Nam and their dedication to civil disobedience as a means of bringing the war to an end. They further classify their prosecution as an attempt to vindicate the former Director of the Federal Bureau of Investigation. Could these motives, attributed to the Department of Justice, be sustained there would be no doubt in our mind that prosecution here would fall outside of the proscribed limits of the discretionary control of the executive over the prosecution of criminal cases. However, upon these bold assertions the defendants cannot place upon the government the burden of disproving the existence of bad faith. Nor, in light of the authority which frowns upon judicial review of executive discretion, are we justified in examining the prosecutorial files.

The defendants (without any evidence whatever in support thereof) claim that the prosecutor's file contains memoranda which will provide irrefutable evidence of the existence of discriminatory enforcement and bad faith prosecution. However, they cannot sustain their claim. They have not satisfied the court of the probability that such memoranda exists. We are not willing to allow them to inspect the files in order to see what they might be able to find. Before such a drastic procedure is initiated, it is incumbent upon the defendants to present evidence from which at least an inference of the use of improper standards can be drawn. Even though the government may be in possession of facts unavailable to the defendants, we are not willing to reverse the burden of proof and require the government to come forward with evidence unless the record indicates the existence of invidious discrimination. United States v. Crowthers, 456 F.2d 1074 (4th Cir. 1972). Our review of the record in the instant case fails to reveal the presence of any such invidious discrimination. We, therefore, will not require the government to come forward with evidence to rebut an inference unsupported by the record.

The defendants have attempted to establish that the sending of letters to and from prison outside of the regular prison channels is a common infraction which has never been prosecuted as a violation of § 1791 under circumstances similar to those of the instant case. That conclusion is not at all supported by the evidence, as the government has introduced indictments of three prosecutions known to them in which the violations of 18 U.S.C. § 1791 were based on the smuggling or possession of contraband letters. The existence of the paucity of similar prosecutions is equivocal at best as we have held that the exercise of selectivity in the prosecution of similarly situated defendants is not of itself a constitutional malady. Moreover, it would be of little aid to the defendants if there had never been a prosecution under 18 U.S.C. § 1791 founded solely upon attempts to send and receive letters outside of the normal prison mail system, unless they could also prove that the decision to prosecute in the instant case was based upon an unjustifiable standard. See, United States v. Gebhart, supra; United States v. Alarik, 439 F.2d 1349 (8th Cir. 1971); United States v. Sacco, 428 F.2d 264 (9th Cir. 1970); Moss v. Hornig, supra; United States v. Rickenbacker, 309 F.2d 462 (2d Cir. 1962); Mottram v. Murch, 330 F.Supp. 51 (S.D.Me.1971); United States v. Maplewood Poultry Co., 320 F. Supp. 1395 (N.D.Me.1970).

As previously stated, notwithstanding defendants' assertions to the contrary, we find no inference of invidious discrimination from the record now before the court. The defendants refer to several alleged facts from which they contend such an inference can be drawn. The court, however, does not attach the same degree of significance to these occurrences. Defendants' references are

voluminous and we therefore shall briefly refer to those upon which defendants most heavily rely.

█ The defendants have drawn our attention to the statement made by the late J. Edgar Hoover before the Senate Committee on Appropriations in November of 1970 in which he referred to "an incipient plot on the part of an anarchist group" the so-called East Coast Conspiracy to Save Lives, led by Philip and Daniel Berrigan, then plotting to kidnap a high public official and blow up tunnels in Washington, D. C. as a means of protest against the Viet Nam War. The inference they would have us draw from this statement is that they were prosecuted solely to justify the above statement which was allegedly made without sufficient evidentiary foundation, and in fact precipitated the investigation upon which this prosecution was based. This claim is spurious as it is clear from the record that the FBI and the Department of Justice had been investigating these defendants in regard to the subject matter of this prosecution and were in possession of a great deal of evidence, including the letters upon which Counts IV through X of the indictment were based, for several months before Mr. Hoover addressed the Senate Subcommittee. That the investigation continued after the statement was made is of no significance. Nor do we feel that the use of a prisoner as an informant indicates the presence of bad faith. Our law enforcement agencies cannot pick and choose the person most suitable as an informant, but must rely upon the exigencies of the situation. It may be that for the most part, prison administrators frown upon the use of prisoners as informants; however, in the instant case,

we fail to see how the FBI in the exercise of its law enforcement duties had an alternative.[12]

█ Defendants further contend that this court has thwarted their fifth and sixth amendment rights to obtain and introduce evidence relevant to their defense of discriminatory prosecution. First, defendants assail this court's decision to quash subpoenas served by the defendants upon Richard Kleindienst, J. Edgar Hoover and Norman Carlson in which they sought for the most part discovery of interdepartmental memoranda of the Justice Department and the Bureau of Prisons containing legal memoranda, advisory opinions and prosecutorial recommendations and decisions pertaining to 18 U.S.C. § 1791 violations. For reasons identical to those relied upon by the court in declining to inspect the prosecutor's file in the instant case, we refused to allow the defendants access to these materials, if existent. It is clear that through these subpoenas defendants are attempting to circumvent a long-accepted intolerance toward judicial inquisition into the process whereby prosecutorial decisions are formulated. United States v. Cox, *supra*; Spillman v. United States, *supra*. This court will not become the vehicle by which the integrity of the executive's decision-making process is violated in pursuit of a claim of discrimination which we consider to be patently frivolous.

█ Next, defendants cite the court's refusal to allow the defendants to fully explore the Bureau of Prison's policy against the use of prisoners as informants through examination of Assistant Director of the Federal Bureau of Prisons Richard Heaney. As previously stated, the court does not consider the

---

12. The defendants also claim to be able to find an indication of discriminatory enforcement from the fact that the government chose to resubmit its case to the Grand Jury to obtain a superseding indictment in which several new counts and two new defendants were added and to which the contents of two letters written by Sister McAlister and Philip Berrigan were annexed. Criminal charges may be modified by means of a superseding indictment if continuing investigation or reevaluation of the substantive law so warrants. The inferences of bad faith which the defendants draw therefrom are not logical conclusions. They are nothing more than unsupported allegations.

We also fail to detect the presence of bad faith from the naming of unindicted co-conspirators in the second indictment.

use of Boyd Douglas, then a federal prisoner at Lewisburg Penitentiary to gather evidence against these defendants as any indicia whatsoever of discriminatory prosecution. Assuming the existence of a policy against the use of prisoners as informants, we find the subject irrelevant to the ultimate issue and, therefore, any further testimony in that regard would have been of little if any value. Whatever prejudice may have resulted thereby would certainly not require a judgment of acquittal.

■■■ Thirdly, the defendants ask this court to grant their motions for judgment of acquittal because of our refusal to allow Assistant United States Attorney Harry Nagle to testify concerning the factors considered in rendering the decision to decline prosecution of Boyd F. Douglas for violations of 18 U.S.C. § 1791. The United States Attorney General, pursuant to the authority vested in him by 5 U.S.C. § 301 [13] has promulgated Departmental Order 381–67 (28 C.F.R. § 16.1, et seq.) providing, *inter alia,* that no information contained in the files of the Department of Justice may be disclosed without obtaining the prior approval of the Attorney General. In the instant case the Attorney General has instructed Mr. Nagle not to testify nor produce documentary evidence concerning its decision to decline prosecution of Boyd Douglas. Departmental orders similar to 381–67 have been held valid by the United States Supreme Court in United States ex rel. Touhy v. Ragen, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951). Moreover, we conclude that the Attorney General's decision to prohibit disclosure was proper. Concessions made to informants including the promise to decline prosecution in return for continued coopera-

tion in the investigation of criminal activity are neither uncommon nor impermissible. Testimony as to the decision to decline prosecution of Douglas would have been irrelevant to the issue of whether these defendants were the victims of impermissible discrimination, and such decision was totally within the discretion of the Department of Justice.

II. (e) Equal Grant of Immunity.

Defendants present the argument that they were denied their constitutional right to obtain and present evidence based on three contentions.

■■ First, defendants sought to have the court provide an equal grant of immunity to defense witnesses. Otherwise, defendants argued, an unequal result would follow. This court rejected a similar motion during trial, finding itself without power to so act. The government counsel informally rejected the defendants' requests for grants of immunity for its witnesses.

The case law on the matter is virtually non-existent save for the key case of Earl v. United States, 124 U.S.App.D.C. 77, 361 F.2d 531 (1966), cert. denied, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967).[14] Defendants find solace in a footnote in Earl to the effect that things would have been "different and more difficult" if only one eyewitness were granted immunity, while another, favorable to the defendant, was not granted immunity. This court prefers to look to the law set down in the opinion of (then Circuit Judge) Warren Burger.

"What Appellant asks this Court to do is command the Executive Branch of the government to exercise the statutory power of the Executive to grant immunity in order to secure relevant testimony. This power is not

---

13. "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public

or limiting the availability of records to the public."

14. *See also,* Morrison v. United States, 124 U.S.App.D.C. 330, 365 F.2d 521 (1966); Ellis v. United States, 135 U.S. App.D.C. 35, 416 F.2d 791 (1969) wherein the Court of Appeals for the District of Columbia reaffirmed Earl.

inherent in the Executive and surely is not inherent in the judiciary. In the context of criminal justice it is one of the highest forms of discretion conferred by Congress on the Executive, i. e., a decision to give formal and binding absolution in a judicial proceeding to insure that an individual's testimony will be compelled without subjecting him to criminal prosecution for what he may say. The effect of the immunity grant avoids any incrimination. The Government does not suggest that Congress could not provide for a procedure giving a defendant a comparable right to compel testimony, but only that Congress has not done so. Whatever the merits of the arguments in favor of such a procedure, it is obvious that it would require safeguards to preclude abuses; the complexity and difficulty of evaluating the impact of that course suggests at once the inadequacy of the facilities available to the judiciary to make the assessment. We conclude *that the judicial creation of a procedure comparable to that enacted by Congress for the benefit of the Government is beyond our power.*" Earl v. United States, at 534. (Emphasis added)

This court finds itself without the power to act as defendants would prefer.

Therefore the merits of the defense argument are of no moment.

## III. ELECTRONIC SURVEILLANCE

Prior to trial of the above-captioned case, defendants filed a Motion for Disclosure of Electronic Surveillance, for a Pre-Trial Hearing, to Suppress Evidence, and to Dismiss the Indictment. The government at that time disclosed that it had overheard conversations of defendants John Theodore Glick [15] and perhaps of Sister Elizabeth McAlister during the course of an electronic surveillance expressly authorized by the President acting through the Attorney General of the United States, without prior judicial approval and deemed "necessary and essential to protect against a clear and present danger to the security of the United States of America."[16] The government denied the use of electronic surveillance as to any other defendant.

By order dated November 12, 1971, this court granted the defendants' motion to suppress the use of any evidence obtained as a direct result of the disclosed electronic surveillance of the conversations of defendants Glick and McAlister.[17] In all other respects the de-

15. As defendant Glick was subsequently severed from this indictment, the issue of electronic surveillance as to this defendant is not presently before the court.

16. Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520 provides for the limited use of electronic surveillances subject to prior court approval, in the investigation of certain classes of crimes. Congress, however, added the following proviso to the conditions necessary to conduct lawful surveillances (18 U.S.C. § 2511(3)). The relevant language of that proviso reads: "Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means or against

any other clear and present danger to the structure or existence of the Government."

It was upon this proviso that the Government based its contention that the surveillance of McAlister and Glick was lawfully instituted.

17. The court's holding in this regard was based upon the decision of the Sixth Circuit Court of Appeals, in United States v. U. S. D. C. For Eastern District Of Michigan, Southern Division & Honorable Damon J. Keith, 444 F.2d 651 (6th Cir. 1971), subsequently affirmed by the United States Supreme Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). There the Supreme Court held the use of electronic surveillance conducted by the Attorney General in national security cases dealing with domestic organizations without prior judicial

fendants' motion was denied generally with the exception that if convictions resulted, a post trial hearing would be held as required by Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L. Ed.2d 176 (1969) to determine whether any convictions were "tainted" by the introduction of evidence which was obtained by the utilization of illegal electronic surveillance.[18]

Subsequent to the convictions of defendants Berrigan and McAlister on Counts IV through X, and pursuant to the Supreme Court's holding in Alderman a post trial hearing was scheduled for the express purpose of allowing defendant McAlister to examine the appropriate FBI investigators in regard to the connection between the logs of the two recorded conversations and the evidence upon which her convictions were based. *See* United States v. Fox, 455 F.2d 131 (5th Cir. 1972). Additionally, the government turned over to defense counsel a tape recording of the two conversations in which defendant McAlister was thought to have been overheard, as well as a transcribed log of those overhearings.[19]

The ultimate issue, of course, is whether either of these defendants' convictions was "tainted" by evidence obtained by the use of illegal electronic surveillance in violation of the fourth amendment rights. However, during the course of the pretrial and the post trial hearings and legal arguments held in conjunction therewith, two preliminary

issues have arisen which must be decided before the question of "taint" can be adequately resolved. The first issue concerns the extent of the standing of each defendant under the fourth amendment to contest the use of evidence obtained by illegal electronic surveillance. Secondly, and in conjunction with the first issue, is the issue of whether the government has disclosed to the defendants the existence of all illegal electronic surveillance to which they may object.

 A defendant may not successfully urge suppression of illegally obtained evidence unless his own rights were violated by the search itself. Jones v. United States, 362 U.S. 257, 261, 80 S. Ct. 725, 4 L.Ed.2d 697 (1960). Fourth Amendment rights are personal rights which may not be asserted by one who is not the victim of the unlawful intrusion, even though evidence illegally obtained from another may have been introduced against him. A violation of one's fourth amendment right to be free of unreasonable searches and seizures by the use of electronic surveillance, in our estimation, occurs only when his own conversations are illegally overheard or when conversations occurring on his premises are overheard, regardless of whether he was present or participated in the latter. Alderman v. United States, *supra*, 394 U.S. at 176, 89 S.Ct. 961.[20]

Defendants urge that they also have standing to object to evidence obtained from any electronic surveillance conducted upon the premises of others at

---

approval to be violative of the fourth amendment. Speaking for the Court, Justice Powell stated:

"We recognize, as we have before, the constitutional basis of the President's domestic security role, but we think it must be exercised in a manner compatible with the Fourth Amendment. In this case we hold that this requires an appropriate prior warrant procedure."

18. See our memorandum and order dated November 12, 1971, in which we fully set forth our reasons for deferring the issue of illegal electronic surveillance until after the trial if a conviction resulted.

19. By stipulation of counsel, a protective order was entered limiting disclosure of the contents of these transcripts to defendants Berrigan and McAlister and their counsel.

20. In preparation for the post trial hearing defendants sought, through subpoenas served upon Richard Kleindienst and the late J. Edgar Hoover, to compel the government to produce tape recordings and transcripts of electronic surveillance which, as we shall subsequently discuss, they were not entitled to under Alderman. Therefore, except as to transcripts of the two McAlister overhearings, the government's motion to quash the two subpoenas was granted.

which they claim to have had an expectation of privacy *irrespective of whether their own conversations were recorded at these premises.* We do not read the Supreme Court's decision in Alderman as extending the right to suppress evidence beyond the limits expressed above, and we, therefore, reject this contention. Nor are we inclined to rule otherwise because of the holding of the District of Columbia Court of Appeals in Baker v. United States, 131 U.S. App.D.C. 7, 401 F.2d 958, 986 (1968). In that case it was held that a defendant had standing to suppress any evidence obtained through electronic surveillance of an associate's office in which it was shown defendant had an expectation of privacy, whether he was a participant in or present at the particular overheard conversations. As that case was decided before Alderman, we find that by failing to expand a defendant's standing to suppress evidence to such a situation, the Supreme Court implicitly disapproved of the circuit court's decision.

 It is also contended that these defendants have standing to suppress evidence derived from any wiretaps instituted by the FBI at the premises of another, but for the purpose of gathering evidence against them (presumably during the investigation of "The East Coast Conspiracy to Save Lives"). This contention is based upon §§ 2510(11) and 2518(10)(a) of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510(11) and 2518(10)(a). Section 2518(10)(a) provides that an "aggrieved person" may move to suppress the contents of a wire or oral communication intercepted in violation of the act, and § 2510(11) defines "aggrieved person" as "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." We interpret the latter phrase as synonymous with the Supreme Court's language in Alderman conferring standing upon one whose premises are the subject of electronic surveillance.[21] That is, one against whom an interception is directed is one whose premises have been surveilled by means of an electronic listening device installed upon his telephone. Electronic surveillance instituted against one member of a group of alleged co-conspirators does not *a fortiori* violate the fourth amendment rights of the other members of the group, but only those individuals whose conversations have been monitored thereby.

 Secondly, the court is satisfied that the government has fully disclosed the utilization of all electronic surveillance to which the defendants may object.[22] The electronic surveillance dur-

---

21. The legislative history of the Omnibus Crime Control and Safe Streets Act of 1968 indicates that the phrase "aggrieved person" should be construed to reflect the existing constitutional rules on standing. *See*, S.Rep.No.1097, 90th Cong. 2d Sess., at 91, 106. The definition of "aggrieved person" in the act was, therefore, not intended to create a substantive extension of the exclusionary rules promulgated by the judiciary. Alderman, *supra*, 394 U.S. at 176, n. 9, 89 S.Ct. 961.

22. When an "aggrieved person" moves pursuant to 18 U.S.C. § 2518(10)(a) to suppress evidence allegedly derived from the utilization of illegal electronic surveillance, 18 U.S.C. § 3504(a)(1) provides that the government shall either affirm or deny the occurrence of the unlawful surveillance. The government may deny the existence of surveillance by means of an affidavit; however, if the situation so warrants, an evidentiary hearing may be held. In Re Horn, 458 F.2d 468 (3d Cir. 1972).

In the instant case, during the post-trial hearings, defendants were allowed to examine Special Agent Gary Watt who conducted a review of the indices of the FBI Central Files on electronic surveillance, and Special Agent Mason Smith, the agent in charge of the surveillances during which the two disclosed conversations of defendant McAlister were overheard. Additionally, the government filed an affidavit by Special Agent Thomas A. Walsh of the New York Field Office of the FBI. It is upon this testimony and affidavit that

ing which the voice of defendant McAlister was overheard was instituted on November 24, 1970 and was discontinued on January 6, 1971 (exclusive of the dates December 24, 1970 through January 2, 1971). The government has stated that the two disclosed conversations of Sister McAlister are the only conversations of either defendant (McAlister or Berrigan) overheard during that particular surveillance or at any other time. The government further asserts that it has never installed an eavesdropping device at any of the premises of either defendant.

 The defendants, however, claim to be entitled to inspect the entire six-week surveillance log. We disagree. Each defendant may object to evidence obtained from illegal surveillance only of his own conversation or conversations occurring upon his premises. Therefore, the defendants are only entitled to examine the logs of their own conversations and not those of conversations of co-defendants or co-conspirators. Testimony during the post trial hearings revealed that there were conversations occurring during the six-week surveillance in question in which unidentifiable voices were heard. Again citing Baker v. United States, *supra*, defendants contend that the transcripts of those conversations should have been turned over to them to enable them to determine if any of the unidentified voices belonged to either McAlister or Berrigan. Unlike the situation in Baker, there is no testimony from the defendants in the instant case that either defendant engaged in conversations, other than those disclosed, which might have been overheard by means of

the surveillance in question.[23] As defendant Berrigan was incarcerated at federal prison in Danbury, Connecticut, throughout the course of this surveillance, the court can obviously conclude that his voice could not possibly have been overheard through this device. Moreover, Mason Smith, the Special Agent in charge of this surveillance, testified unequivocally that no leads whatsoever resulted from any of the conversations overheard during the six weeks of electronic surveillance. We find this disclaimer sufficient basis to refuse defendants the right to inspect the logs of the conversations of unidentified persons; and in light of the government's disclaimer and in the absence of testimony indicating the existence of other conversations we do not find it necessary to inspect the logs *in camera* for the possible presence of other conversations of Sister McAlister. Our conclusion here is buttressed by the fact that the surveillance was conducted months *after* the offenses with which we are here concerned had been committed and apparently long after the government's possession of all facts relating to these offenses.

 The defendants also assail the adequacy of the government's disclaimer of the use of electronic surveillance as to these defendants, other than the six-week surveillance during which the two disclosed conversations of defendant McAlister were overheard. This court, however, finds the testimony and affidavits of the government sufficient to substantiate their disclaimer. Special Agent Gary Watt testified that his review of the indices of the Central Files

the court concludes that the government has adequately disclaimed the existence of other electronic surveillance to which defendants have standing.

23. The defendants requested a modification of the protective order to allow disclosure of the existence of the surveillance to the individual whose telephone was tapped. It is contended that if such a modification were forthcoming that individual would testify to the occur-

rence of other conversations in which Sister McAlister participated during the period of this surveillance. However, inasmuch as Sister McAlister herself would have been free to testify concerning the possibility of other overheard conversations and their connection with the evidence introduced against her, our refusal to allow the requested modification of the protective order did not prejudice the defendant nor destroy the effectiveness of the hearing.

of the FBI revealed that neither of these defendants had been the subject of electronic surveillance. That is, neither defendant had been registered to a telephone number to which a listening device had been installed, nor had the voice of either been overheard through such a device, other than the disclosed conversations of McAlister. The defendants contend that the FBI's Central Files would not associate a defendant's name with a listening device placed upon a telephone at his residence unless the telephone at those premises was registered in the name of that defendant. As the telephone at several of Sister McAlister's places of residence, or places of employment, is not registered in her name, but in the name of her Religious Order, the defendant's argument proceeds, the FBI's Central File would not reveal its presence under her name. Agent Watt testified that there was no central index as to place. However, Agent Watt also testified that he had made inquiries of each field office as to whether these defendants had been the subject of electronic surveillance by that office and had received negative responses. Moreover, the affidavit of Special Agent Thomas A. Walsh of the New York Field Office affirms that none of the residences or places of business of Sister McAlister were the subject of electronic surveillance.

There are two further grounds urged by defendants to cast doubt upon the government's disclaimer. First, there remains the possibility that the voice of either defendant may have been among those unidentified voices overheard through electronic surveillance conducted at some time in the past by the FBI. Special Agent Mason Smith testified that there are very few instances in which the identity of participants of an overheard conversation cannot be ascertained. The court does not deem these few instances as sufficient to justify non-acceptance of the government's disclaimer, nor would they warrant allowing defendants unlimited access to government files and logs of other electronic surveillances since the possibility that either defendant may have standing as to other surveillances is extremely remote. Secondly, the defendants contend that the check of the FBI files would not reveal the existence of electronic surveillance by other agencies such as the IRS, the CIA, or state and local agencies. However, there was no testimony introduced during the defendant's trial or at the post trial hearings from which it could be contended that any agency other than the FBI was involved in any way with the investigation of this case. The court is convinced that if surveillance by any other agency had occurred, the Department of Justice was completely unaware of it and that no evidence introduced at defendants' trial could have been "tainted" thereby.

Being satisfied that the defendants are in possession of the transcripts of all overheard conversations to which they are entitled, we turn now to the issue of whether evidence introduced at their trial was derived in any way from the two overheard conversations of Sister McAlister. We find that it was derived not from the use of electronic surveillance but from completely independent sources.

After the government has disclosed the existence of illegal surveillance, Alderman provides that it is incumbent upon the defendant to come forward with specific evidence demonstrating taint. The ultimate burden then shifts to the government who must show that the source of its evidence was not the fruit of the surveillance. *See*, United States v. Ivanov, 342 F.Supp. 928 (D. N.J.1972). The defendants must be able to show a nexus between the evidence upon which their prosecution was based and the contents of the overheard conversations. This nexus has not been shown in the instant case; therefore, the burden has never shifted to the government. However, assuming that it has, we hold that the government has unequivocally demonstrated that its evidence was untainted by the surveillance.

The contents of the recorded conversations are innocuous, insignificant, and totally unrelated to any evidence introduced by the government at the defendant's trial. They were recorded approximately three months after the last contraband offense was committed and long after the Federal Bureau of Investigation was in possession of all relevant evidence relating thereto, including the contraband letters. It is clear from the trial that the source of the evidence introduced against defendants Berrigan and McAlister as to the contraband violations was Boyd Douglas who had been in close contact with the FBI since June of 1970. Douglas's testimony was corroborated by witnesses Sandel, Rom, Hoover, Sister Russel and Sister Savard, whose identities and roles in the events testified to were disclosed to the FBI by Douglas months before the surveillance was installed.

There was extensive testimony at the post trial hearings from the Special Agents assigned to conduct the surveillance in question. The government has admitted that one of the purposes of this surveillance was to further their investigation of these defendants; however, they assert that the surveillance was completely fruitless. Agent Mason Smith testified that, as Special Agent in charge of this surveillance, any leads or investigation resulting from the overheard conversations would have been instituted by him. Since there was no pertinent information gained from the surveillance, no leads were sent out, nor were any other agents informed of the contents of any overheard conversations. Agent Smith's testimony was that the surveillance logs were placed in a safe in the Field Office, and to his knowledge were never removed therefrom during the investigation of this case. His testimony is corroborated by the affidavits of Agents William Anderson, Charles A. Durham, and Joseph Jamison of the Philadelphia Field Office. They affirm that no leads were sent out as a result of this surveillance and that no one other than Agent Smith had inspected the contents of the surveillance logs.

As the court has found no indication of taint as a result of the electronic surveillance of the two conversations of defendant McAlister, the government must prevail.

For the reasons herein stated, defendants' post trial motion for judgments of acquittal and in arrest of judgment are hereby denied. The convictions of Father Berrigan on Counts IV, VI, VIII and X are affirmed and the convictions of Sister McAlister on Counts V, VII and IX are affirmed.