**Katherine W. BURKHART et al.**

v.

**William B. SAXBE et al.**

**Civ. A. No. 74–826.**

United States District Court,
E. D. Pennsylvania.

March 21, 1978.

See also 397 F.Supp. 499.

David Rudovsky, Kairys, Rudovsky & Maguigan, Philadelphia, Pa., for plaintiffs.

Gordon W. Daiger, Atty., Sp. Litigation Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

Presently before the court are plaintiffs' motion for partial summary judgment and defendants' cross motion for complete summary judgment. Many factual contentions are not disputed, but others will require a fact finder's determination. The procedural posture of the case, however, permits clarification of some of the prevalent legal issues at this stage of the litigation thereby establishing an appropriate foundation for the ultimate disposition of the controversy. Rule 56(d), Federal Rules of Civil Procedure.

I.

### A. Factual Background

This case arises indirectly from a series of criminal and civil cases which were generated by the social turbulence of the late sixties and early seventies.[1] During the course of the discovery proceedings in *Philadelphia Resistance v. John Mitchell*, C.A. 71–1738 (E.D.Pa.), the parties ascertained that certain of the plaintiffs' telephone conversations were overheard by agents of the Federal Bureau of Investigation (FBI) who were at the time monitoring certain wiretaps[2] placed pursuant to authorization by the then Attorney General of the United States, John Mitchell.[3] No prior court authorization for the wiretaps was obtained.

The plaintiffs, Burkhart, Chomsky, Gold, Portnoy and Putter were overheard during the course of the electronic surveillance of the telephone registered to one William Davidon (the Davidon tap) who was suspected of being an active member of an organization known as the East Coast Conspiracy to Save Lives (ECCSL). The plaintiffs, Gold, Portnoy and Markel[4] were overheard during the course of the electronic surveillance of the telephone registered to the Philadelphia chapter of the Black Panther Party (the Black Panther tap).

Pursuant to information compiled through the investigative processes of the FBI and furnished to the United States Department of Justice, Attorney General Mitchell authorized the FBI to initiate and conduct, without a warrant or prior judicial approval, the two wiretaps at issue in this case. The Black Panther tap was originally authorized on June 1, 1970 and reauthorized on June 25, 1970, August 15, 1970, September 22, 1970, November 11, 1970 and finally terminated on February 10, 1971.[5] The Davidon tap was authorized on November 6, 1970, reauthorized on December 7, 1970 and terminated on January 6, 1971.[6]

The plaintiffs were admittedly not the targets of these investigations and a review of the logs of these taps containing plaintiffs' conversations suggest that the information contained therein was not relevant to the claimed purpose of the surveillance.

The plaintiffs claim that these warrantless wiretaps violated their fourth amendment right to be secure against unreasonable searches and seizures as well as the provisions of Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520. The defendants respond, *inter alia,* on the grounds that the wiretaps were authorized by the Attorney General for national security purposes and therefore were exempt from the provisions

1. The criminal and civil litigation which forms the historical background to this present action is documented in the following opinions; *Burkhart v. Saxbe*, 397 F.Supp. 499 (E.D.Pa.1975); *Philadelphia Resistance v. Mitchell*, 63 F.R.D. 125 (E.D.Pa.1972); *Philadelphia Resistance v. Mitchell*, 58 F.R.D. 139 (E.D.Pa.1972). *See also, United States v. Ahmad,* 347 F.Supp. 912 (M.D.Pa.1972), *modified sub nom. United States v. Berrigan,* 482 F.2d 171 (3d Cir. 1973); *United States v. Ahmad,* 335 F.Supp. 1198 (M.D.Pa.1971); *United States v. Ahmad,* 329 F.Supp. 292 (M.D.Pa.1971); *United States v. Ahmad,* 53 F.R.D. 194 (M.D.Pa.1971).

2. There are two companion cases which also resulted from these wiretaps and which raise identical legal issues. *Forsyth v. Kleindienst,* 447 F.Supp. 192, C.A. 72 1920 (E.D.Pa.); *McAlister v. Kleindienst,* C.A. 72 1977 (E.D. Pa.).

3. John Mitchell was Attorney General from January 20, 1969 to March 2, 1972. William

Saxbe was Attorney General from January 4, 1974 to February 3, 1975. Clarence Kelly has been director of the FBI since July 9, 1973.

4. The plaintiff, Markel, was added to this lawsuit by stipulation of the parties dated, March 22, 1976. The suit was originally filed on April 1, 1974.

5. The surveillance was actually conducted during the following time periods: July 13, 1970 to July 14, 1970; August 25, 1970 to November 10, 1970; November 23, 1970 to January 11, 1971; January 16, 1971 to February 10, 1971. Certain of the reauthorizations were necessitated by the fact that the phone service was discontinued and the headquarters moved to a new location and thereafter reinstated when the headquarters returned to the original site.

6. The surveillance was actually conducted from November 24, 1970 to January 6, 1971.

of Title III, and did not require prior judicial approval. Defendants further assert they are clothed with official immunity.

## B. *Legal background*

A determination of whether the defendants' conduct was unlawful, and, even if unlawful, whether they are nonetheless immune from liability by reason of a good faith, reasonable belief that such action was not unlawful, requires an historical analysis of the state of the law during the period in question.

In 1967, the Supreme Court decided two major cases that established the limitations imposed by the fourth amendment upon the use of electronic and other technologically sophisticated listening devices by law enforcement officers in conducting investigations. The first case was *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); the second, *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Berger,* the petitioner was convicted of a conspiracy to bribe state officials. Agents of the district attorney's office had obtained a court authorization to plant an electronic listening device (a "bug") in the offices of two suspected co-conspirators. The authorization was based on a New York statute, § 813–a of the New York Code of Criminal Procedure. The overheard conversations were received in evidence at trial, over objection. In holding the New York statute invalid because of its overbreadth, the court ruled that authorization to conduct an unconsented entry upon another's property in order to gather evidence through a surreptitiously placed listening device, may be granted only under the "most precise and discriminate circumstances." *Berger, supra,* 388 U.S. at 56–57, 87 S.Ct. at 1882. The court set forth general guidelines. There must be a satisfactory showing of a particularized need for such surveillance, and of the specific type of information sought. *Id.* The authorization should describe with particularity the type of conversations to be overheard so as to allow the officers conducting the surveillance to ascertain when the objective has been satisfied. The authorization must be limited in time and scope, in order to protect against unlimited interference with the suspects' rights of privacy. When the objective is obtained, the surveillance must be promptly terminated. Upon completion of the surveillance, a return should be made to the authorizing official detailing the carrying out of the authorization and specifying the conversations overheard or otherwise seized. A state may not authorize an intrusive surveillance "until it has reason to believe that a specific crime has been or is being committed." *Id.* at 59, 87 S.Ct. at 1883.

*Katz v. United States, supra,* held that the fourth amendment protected against warrantless nontrespassory wiretaps as violative of a person's right of privacy. *Katz* involved a wiretap placed upon a public telephone. The Supreme Court ruled that the exclusionary rule precluded use of the overheard conversations at trial. *Katz* thus overruled the long standing rule of *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), that nontrespassory wiretapping did not violate the fourth amendment.

Critically relevant to the present case is footnote 23 to the *Katz* opinion, *supra* 389 U.S. at 358–359, 88 S.Ct. at 515, which states:

> Whether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving national security is a question not presented by this case.

*See also* the discussion as to "national security" and "executive branch" wiretaps in the concurring opinions of Justices Douglas and Brennan, *id.* 389 U.S. at 359, 88 S.Ct. 507, and the separate concurring opinion of Justice White, *id.* at 362, 88 S.Ct. 507.

Following the *Berger* and *Katz* decisions, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520.[7] The statute, in sub-

---

7. U.S.Code Cong. and Admin.News, pp. 2112, 2113 (90th Cong. 1968), which sets forth the

legislative history, suggests that Title III was enacted in response to the decisions in *Berger*

stance, prohibits the interception and use or disclosure of wire or oral communications, § 2511, except where it is specifically authorized for the purpose of investigating certain classes of crimes, § 2516, and then only after full compliance with the elaborate procedures specified in § 2518. Aside from criminal penalties, any person whose wire or oral communications are intercepted, disclosed or used in violation of the Act, may recover actual damages in a civil action to be computed at not less than One Hundred Dollars ($100) a day for each day of the violation not to exceed One Thousand Dollars ($1,000), plus any punitive damages and reasonable costs and attorney's fees, § 2520. However, the defendant in any civil or criminal action brought pursuant to this or any other statute prohibiting the interception of wire or oral communications is accorded a complete defense if he acted in good faith reliance upon a court order or legislative authorization, § 2520.

Pervasive as this statute is in the area of electronic surveillance, Congress nonetheless included the following proviso regarding the President's constitutional power to utilize these investigative tools for the purposes of protecting the national security and conducting the nation's affairs, 18 U.S.C. § 2511(3):

Nothing contained in this chapter . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial, hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power.

In the years following the *Berger* and *Katz* decisions and the enactment of Title III, the President, through his delegate, the Attorney General, continued the earlier prevalent practice of authorizing warrantless electronic surveillance where he deemed such necessary or appropriate to secure the nation against internal or external threats.[8] During this period the warrantless wiretaps at the center of this litigation were authorized by the Attorney General and conducted by the defendants ostensibly for "national security."

The issue expressly left unanswered in the *Katz* decision, and further complicated by Congress's enactment of the proviso embodied in 18 U.S.C. § 2511(3) upon which defendant Mitchell relied in continuing the practice established by his predecessors,[9] finally reached the Supreme Court in *United*

---

and *Katz* which radically changed the law relevant to governmental electronic eavesdropping.

**8.** The Supreme Court recognized in *United States v. United States District Court,* 407 U.S. 297, 310–311 n. 10, 92 S.Ct. 2125, 33 L.Ed.2d 752 and the defendants have alleged and argued throughout this litigation, that successive Presidents since 1940 have authorized the use of electronic surveillance for national security purposes. President Roosevelt authorized Attorney General Jackson to conduct wiretapping in situations involving a foreign threat to this nation and Attorney Generals Tom Clark and Herbert Brownell advised and urged Presidents Truman and Eisenhower, respectively, of the necessity for electronic surveillance in internal security matters. *See United States v. United States District Court,* 444 F.2d 651 (6th Cir. 1971) (Appendix), *aff'd.* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

**9.** *See* Affidavit of John N. Mitchell attached to defendants' motion for summary judgment and depositions dated October 23, 1975 and October 14, 1976.

*States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (hereinafter *Keith*). The case involved a criminal prosecution in which one of the defendants, charged with conspiracy to destroy government property, namely, the offices of the Central Intelligence Agency, had been the subject of electronic surveillance. The government filed an affidavit which stated, essentially, that the wiretap had been conducted without prior judicial approval, to gather information necessary to protect the nation from certain domestic security threats. The district court,[10] reviewing the logs of the interceptions, *in camera,* determined that the wiretaps violated the fourth amendment and ordered the government to fully disclose the contents of those logs to the defendant as required by *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).[11] The Court of Appeals for the Sixth Circuit[12] refused to issue a writ of mandamus and upheld the district court's order requiring full disclosure of the overheard conversations.

The government's position was essentially that the wiretaps in question were authorized by the Attorney General pursuant to the President's constitutional power to protect the national security from threats by domestic organizations and did not require prior judicial approval. The government relied upon the President's constitutional duty to protect the nation, U.S.Const., Art. II, § 1, contending that warrantless wiretaps were historically recognized by prior administrations and expressly recognized by Congress in adopting 18 U.S.C. § 2511(3).

Confronted with the issue left open in *Katz,* the Supreme Court rejected the government's claim that electronic surveillance for domestic national security purposes was outside the protective umbrella of the fourth amendment. In so doing, the Court interpreted the language of § 2511(3) as an expression of Congress's neutral position with regard to whether the President is constitutionally endowed with the power to eavesdrop, without prior judicial approval, on persons who are deemed by the President to constitute a threat to the nation's security. Having determined that Title III constituted neither a recognition nor limitation on whatever constitutional power the President may enjoy to authorize and conduct such surveillance, the remaining question was to determine the appropriate boundaries, if any, of such power.

Reciting the depth and characteristics of the fourth amendment as construed over the course of almost two centuries, the Court, applying a balancing test, held that the potential danger posed to the individual's right to be free from unwarranted and unreasonable searches and seizures, outweighed the government's need to conduct warrantless electronic surveillances in protecting domestic security. Considering that domestic national security cases often involve first as well as fourth amendment values, the Court determined that prior judicial approval in the form of a warrant issued upon a proper showing by the government does not place an undue burden upon the government's duty to protect the nation's security from domestic subversion. The Court also rejected the government's contentions that a judicial officer would be unable to assimilate and comprehend the numerous complex and subtle factors necessary to determine whether a national security threat exists and that disclosure of such confidential information would substantially increase the danger to the national security and the lives of those individuals involved in its protection. The Court ex-

---

10. *United States v. Sinclair,* 321 F.Supp. 1074 (E.D.Mich.1971).

11. *Alderman* requires the government to disclose to a defendant, charged with a criminal offense, any conversations in which he participated or which were conducted on his premises and which were overheard by the government during the course of an illegal surveillance.

The purpose of this required disclosure is to afford the defendant a fair hearing to determine whether the illegal surveillance tainted any other evidence produced during the criminal prosecution.

12. *United States v. United States District Court,* 444 F.2d 651 (6th Cir. 1971).

pressly limited the decision to domestic security surveillance leaving unanswered the scope of the President's power to conduct electronic surveillance where the threat to national security emanates from a foreign source.[13] *Keith,* 407 U.S. at 308, 92 S.Ct. 2125. This question, however, has been confronted by both the Court of Appeals for the Third Circuit and the District of Columbia.

In *United States v. Butenko,* 494 F.2d 593 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974), the court was compelled to decide the legality of a warrantless surveillance in the context of an *Alderman* proceeding.[14] The defendant was prosecuted for communicating information relating to the national defense to a foreign government and the electronic surveillance was considered necessary to protect against a foreign threat. The court held that *prior* judicial approval was unnecessary to comport with the fourth amendment requirements, where the purpose of the wiretap is solely to protect against threats to our national security emanating from foreign sources. *Id.* at 605.

The Court of Appeals for the District of Columbia Circuit, in a civil suit for damages,[15] held that even where the wiretap was installed to gather information necessary to protect this country's relations with a foreign government, the tap, nonetheless, constituted surveillance of a domestic organization and, therefore, came within the controlling doctrine of the *Keith* decision requiring the government to first obtain a judicial warrant before proceeding with the surveillance. *Zweibon v. Mitchell,* 170 U.S. App.D.C. 1, 516 F.2d 594 (1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).[16]

## II.

### A. *National Security.*

Was the electronic surveillance conducted in this case for the purpose of investigating perceived threats to this nation's security? If, as the plaintiffs' urge, these wiretaps were solely for the purpose of gathering evidence to support a criminal prosecution and/or for the purpose of political harassment and intimidation, then the defendants' conduct in authorizing and conducting this surveillance, without full compliance with the provisions of 18 U.S.C. § 2518 would be actionable under 18 U.S.C. § 2520 as well as the fourth amendment. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). On the other hand, if the purpose of the surveillance was to protect against a perceived threat to national security, it becomes necessary to reach the question of whether the defendants' actions were violative of either Title III or the fourth amendment. Finally, even if violative of Title III or the fourth amendment, are defendants nonetheless immune from liability?

Both parties have propounded extended arguments on the standard this court should apply in evaluating the Attorney

---

**13.** There is no clear line of demarcation between domestic and foreign security threats. As the court recognized,

  No doubt there are cases where it will be difficult to distinguish between "domestic" and "foreign" unlawful activities directed against the government of the United States where there is collaboration in varying degrees between domestic groups or organizations and agents or agencies of foreign powers.

*Keith,* 407 U.S. at 309, n. 8, 92 S.Ct. at 2133.

**14.** *See* note 11, *supra.*

**15.** The suit was instituted by the Jewish Defense League (JDL) to recover damages for the alleged violations of their civil rights as a result of the government's wiretapping their phones without a warrant. The defendants claimed that the surveillance was necessary because officials of the Soviet Union had expressed serious concern as a result of certain public threats of violence aimed against them by members of the JDL.

**16.** *Zweibon,* unlike *Keith* and *Butenko,* confronted the question of warrantless national security wiretapping in the context of civil litigation and was therefore compelled to consider the defendants' claim of immunity as well as the appropriate remedy to be applied in the event liability were to be imposed. The case is procedurally analogous to the present litigation.

General's assertion that the surveillance was necessary for national security purposes. The threshold question on a motion for summary judgment is whether this issue presents a disputed factual question material to the litigation. It seems clear that the question of whether the surveillance was conducted for national security purposes is factual and is material to the ultimate resolution of the litigation.[17] *But cf. Rosenthal v. Rizzo,* 555 F.2d 390 (3d Cir.) (Aldisert, J. dissenting), *cert. denied,* 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977). I need not reiterate the proper analysis to be employed by the court in considering a motion for summary judgment. *See Ettinger v. Johnson,* 556 F.2d 692, 696–697 (3d Cir. 1977). In this case there is a genuine dispute as to the existence of a national security predicate for the authorization of these particular wiretaps.

The deposition of John Mitchell (dated October 23, 1975), supported by the exhibits attached to defendants' answers to plaintiffs' interrogatories, establishes that the FBI had developed information pertaining to certain activities of the ECCSL and that this information formed the basis for Mitchell's conclusion that the nation's security was being threatened and that electronic surveillance would be helpful in minimizing that danger.

The information was developed during the course of investigating the burglary of certain draft board and FBI field offices in 1970. Through the use of an informant, the FBI uncovered what appeared to be a plot by suspected members of the ECCSL to kidnap Henry Kissinger, then National Security Advisor to the President, and simultaneously destroy the heating systems of certain federal buildings located in Washington, D.C.[18] In addition, the FBI furnished Mitchell with background information concerning the activities of William Davidon and the basis for its conclusion that he was an active member and central figure in the ECCSL. Based on this information, Mitchell approved the FBI's request to place a wiretap on Davidon's residence telephone.

The plaintiffs argue that the primary purpose of this tap was to gather evidence to support a criminal prosecution against members of the ECCSL in order to suppress their criticism of the government's Vietnam policy. They urge that because the primary purpose was for a criminal investigation, the defendants' claim of national security should be rejected.

■ It may well be that one of the purposes and certainly one of the possible results of this investigation was ultimately to prosecute those individuals involved in the alleged conspiracy; nonetheless, that alone would not alter the fact that there may have been a bona fide threat to the national security. No doubt one of the most effective means of halting subversive activity aimed at the violent disruption of the government is to criminally prosecute those involved in such unlawful activity. However, simply because the perceived threat to the nation may result in the prosecution of

17. Viewing this as a factual question raises certain problems in the context of civil litigation. In its criminal counterpart, validity of the government's claim is determined by the court either in the context of a pre-search judicial review to determine probable cause or a post search *Alderman* proceeding. If it were necessary to submit this factual question to a jury, the government's contentions in *Keith* as to the complexity of the underlying information and the risk inherent in the increased exposure of this confidential information would warrant careful consideration. The suggestions in *Keith* for eliminating these problems ranging from *in camera* submission of the confidential information to the designation of a special court capable of assimilating and comprehending the information would, of course, be unavailable in a civil trial. None of the cases involving civil litigation of this nature have expressly confronted this problem. *See Zweibon,* 516 F.2d at 607–611; *Halperin v. Kissinger,* 424 F.Supp. 838 (D.D.C.1976); *Hallinan v. Mitchell,* 418 F.Supp. 1056 (N.D.Cal.1976); *Sinclair v. Kleindienst,* C.A. 610–73 (D.D.C., filed Sept. 23, 1977) (unpublished).

18. This plan was discussed in correspondence between Father Philip Berrigan and Sister Elizabeth McAlister, self-proclaimed leaders of the anti-Vietnam war movement during this period. The letters are partially reprinted in *United States v. Berrigan,* 482 F.2d at 177–179.

those from whom the threat emanates does not require that the government's national security claim be rejected.

In this instance, the intended victim of the kidnap plot was the President's senior national security advisor, who was engaged at that time in high level, extremely sensitive negotiations with North Vietnam, a hostile foreign government. It would be ludicrous to suggest that because the plot to kidnap that official constituted a violation of federal law, the national security purpose for conducting the surveillance was either nonexistent or irrelevant. *See Zweibon,* 516 F.2d at 612 n. 39.

The basis for authorization of the Black Panther tap is fully set forth in the affidavit of John Mitchell attached to the defendants' motion for summary judgment and the exhibits referred to therein. The affidavit states, *inter alia:*

> Pursuant to the above described authority, and as indicated in Exhibits B, C, D, E, and F previously filed herein in connection with Defendants' Answers *In Camera* to Plaintiffs' Interrogatories to Defendants, I authorized warrantless electronic (telephone) surveillance on the offices of the Black Panther Party in Philadelphia, Pennsylvania, which appeared to be the headquarters of that organization for the state of Pennsylvania. I initially approved that surveillance on June 1, 1970, deeming it necessary for the collection of intelligence information to protect the functions and structure of the Government and the security of the Nation because: (a) the Black Panther Party had repeatedly advocated the violent overthrow of the Government of the United States and had made persistent and serious threats in that regard; (b) the Black Panther Party had affiliated groups or chapters in 39 major cities in the United States and an organizational mechanism for coordinated activity, giving it an apparent capability to carry out its threats on a significant scale; (c) Black Panther Party members had had frequent contacts, both abroad and in the United States, with representatives of foreign governments having a demonstrated hostility to the United States; and (d) because I believed that the Black Panther Party was receiving funds for its domestic activities from foreign government sources.
>
> I based my belief in the need for the warrantless electronic surveillance on the Philadelphia headquarters of the Black Panther Party on information set forth in Federal Bureau of Investigation requests for the surveillances, which were submitted as Exhibits B, C, D, E, and F in connection with Defendants' Answers *In Camera* to Plaintiffs' Interrogatories to Defendants, on meetings with and briefings by the Director of the Federal Bureau of Investigation, and Black Panther Party literature which had been provided to me. This information reflected that, for example, (1) Black Panther Party leader Eldridge Cleaver had resided in or visited Cuba, Algeria, North Korea, the Soviet Union, North Vietnam, and the Peoples Republic of China; (2) Black Panther Party members had met in Sweden with representatives of the North Vietnamese government; and (3) Black Panther Party members had met with representatives of the Cuban government. This information supported my belief that these contacts were for the purpose of obtaining foreign funds to support Black Panther Party revolutionary activities, including the advocacy of the violent overthrow of existing Federal and state government structures. The threat of such a revolutionary overthrow was preceived [sic] by me to be especially serious in view of (1) the large number of Black Panther Party chapters in this country, (2) the large number of Black Panther Party members, (3) the numerous threats of personal attack that were being directed by the Black Panther Party against local law enforcement officers and even against the President of the United States, and (4) the seditious plan which had been prepared by the Black Panther Party to overthrow the government of the state of Illinois, a copy of which I have appended hereto as Exhibit A.

A review of the affidavit and deposition of John Mitchell [19] in conjunction with the supporting exhibits substantiates that probable cause existed to believe that activities of the Black Panther Party were a threat to the national security and that electronic surveillance of the headquarters in order to gather intelligence information about those activities was warranted. Furthermore, the information supplied to Mitchell by the FBI suggested the possibility that the Black Panther Party was receiving support from certain foreign sources.

I note that whether this constitutes a surveillance for foreign security rather than domestic security purposes is a difficult question [20] which need not at this time be finally resolved. If it was a "foreign security" surveillance, *Butenko, supra,* holds that a warrant was not required.[21] However, for the purposes of this opinion, this tap, like the Davidon tap, will be considered a "domestic security" surveillance within the perimeters of the *Keith* decision.

■ Although a review of the present record, as discussed above, suggests that there was a sufficient basis for the Attorney General to conclude that the nation's security was threatened, I am reluctant to conclude, absent a fully developed record, that the wiretaps in question were, in fact, solely for that purpose or that the use of electronic surveillance was the only or least intrusive means of acquiring the information necessary to protect against this alleged threat. I will, therefore, deny both plaintiffs' motion and defendants' cross motion for summary judgment, and require a full evidentiary hearing to determine whether these wiretaps were, in fact, for the purpose of protecting this nation from a bona fide threat to its internal security or whether defendants claim is merely a pre-

text for gathering information about certain political dissidents.

The existence of a genuinely disputed, material issue of fact is a bar to summary judgment which might alleviate the need for any further discussion of the present motions. However, if it is determined that the fourth amendment is applicable to this case, then the defendants' failure to secure prior judicial approval would be actionable even if, in fact, this surveillance was conducted for national security purposes. Therefore, a resolution of the question as to whether or not the defendants were constitutionally and statutorily required to seek judicial approval prior to initiating this surveillance even assuming a national security predicate, may alleviate the need for testing the factual basis for defendants' national security claim.

## B. *Warrant Requirement*

Assuming that the wiretaps in question were conducted for the purpose of gathering information to protect against unlawful activities considered to be a domestic threat to the nation's security, did the surveillance, conducted without prior judicial approval, violate either the provisions of Title III for which a specific statutory remedy is provided and/or the plaintiffs' fourth amendment rights for which they may recover damages pursuant to the implied cause of action established by *Bivens, supra?* The answer to this question depends upon whether the defendants were required, at the time, to secure a warrant before initiating the surveillance.

### 1. *Fourth Amendment*

At the time these taps were installed, the scope of the President's constitutional pow-

---

**19.** Deposition of John N. Mitchell, dated October 14, 1976.

**20.** *See* note 13 *supra; Zweibon,* 516 F.2d at 613 n. 42.

**21.** If it were determined that the surveillance was necessitated by a foreign threat then under the holding in *Butenko,* no warrant would have been required. On the other hand, if it is considered a domestic security surveillance then,

like the Davidon tap, it becomes necessary to determine whether prior judicial approval was required by the subsequent decision in *Keith.* In either event, the surveillance was not solely for criminal or political information gathering purposes and the plaintiffs' claim that the failure to follow Title III's procedures must result in summary judgment in their favor, at this juncture, will be denied.

er to authorize and conduct warrantless wiretapping for national security purposes had not been delineated by the Supreme Court. It was not until almost a year and a half after these taps were terminated that the Supreme Court in *Keith, supra,* definitively settled the conflict between the fourth amendment and the President's constitutional power to protect the nation.

The defendants argue that the warrant requirement would derive only from a retroactive application of the *Keith* decision which they urge would be improper under the test for retroactivity enunciated in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).[22] In *Chevron,* the Supreme Court set forth the factors to be considered in determining a question of retroactivity.

First, the decision to be applied nonretroactively must establish a new principal of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce sub-stantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." (citations omitted), *id.* at 106–107, 92 S.Ct. at 355.

The defendants rely essentially upon the footnote in the *Katz* decision, the proviso embodied in § 2511(3) of Title III, both of which are quoted *supra,* and the practices of predecessor administrations as establishing that prior to the decision in *Keith,* warrantless wiretapping for national security purposes was a constitutionally permissible practice. They argue, therefore, that *Keith* resolved an issue of first impression which constituted an abrupt change in the law, the retroactive application of which would result in substantial inequitable hardship without furthering the purpose or effect of the newly enunciated rule.

The defendants' reliance upon prior Executive action, the footnote by the Supreme Court and the statutory proviso, as indicia of an established controlling principle of constitutional dimension is misplaced. At best, these indicia establish only that prior to the decision in *Keith,* the law was unsettled. The courts which had the occasion to consider the convergence of the Executive's power and the limitations of the fourth amendment prior to the Supreme Court's ruling in *Keith,* reached differing conclusions.[23] Furthermore, despite continued ex-

---

**22.** For a general discussion of the rules governing retroactivity which have evolved from the numerous Supreme Court decisions. *See* Justice Harlan's dissent in *Desist v. United States,* 394 U.S. 244, 256–69, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1968) (dissenting opinion). Although that discussion centers on retroactivity in the context of criminal litigation, the Court apparently has not distinguished between civil and criminal cases or constitutional and nonconstitutional issues in developing this area of jurisprudence. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 105–106, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); *Linkletter v. Walker,* 381 U.S. 618, 626–627, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1964).

**23.** *See United States v. Clay,* 430 F.2d 165 (5th Cir. 1970) (*rev'd on other grounds,* 403 U.S. 698, 29 L.Ed.2d 810 (1971) (surveillance for purpose of gathering foreign intelligence information does not require prior judicial approv-al); *United States v. Dellinger,* No. 69 Cr. 180 (N.D.Ill., Feb. 20, 1970) (warrant not required prior to surveillance for "national security" purposes); *United States v. O'Neal,* Cr.No. KC–CR–1204 (D.Kan. Sept. 1, 1970) (warrant not required prior to surveillance for "national security" purposes); *United States v. Butenko,* 318 F.Supp. 66 (D.N.J.1970), aff'd 494 F.2d 593 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974) (surveillance for purpose of gathering foreign intelligence information does not require prior judicial approval); *United States v. Brown,* 317 F.Supp. 531 (E.D.La.1971) (warrant not required for foreign security surveillance); *United States v. Smith,* 321 F.Supp. 424 (C.D.Calif. 1971) (warrant required prior to conducting surveillance of domestic organization threatening national security); *United States v. Sinclair,* 321 F.Supp. 1074 (E.D.Mich.), aff'd sub nom. *United States v. United States District*

ecutive prodding, Congress consistently refused to statutorily authorize such conduct and with the passage of the comprehensive statutory scheme governing electronic surveillance embodied within Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520, Congress merely provided that whatever constitutional power the President may possess outside the strictures of the fourth amendment was not to be affected by the provisions of this legislation. *Keith, supra,* 407 U.S. at 321–324, 92 S.Ct. 2125. The extent of the Supreme Court's pronouncements in this area, prior to *Keith,* was the footnote in the *Katz* decision which recognized only that the question of the proper delineation of the limitations placed upon the executive power by the fourth amendment was not an issue to be resolved in that decision. Moreover, three of the justices, in concurring opinions, expressed differing views as to the scope of those limitations.[24]

The fact that the law in this area was unsettled prior to the decision in *Keith* supports two possible conclusions each suggesting a different result as respects the question of the retroactive application of that decision. The defendants urge that the proper conclusion is that *Keith,* clarifying an area of the law theretofore unsettled, resolved an issue of first impression which was not clearly foreshadowed and should not, therefore, be applied retroactively. However, the lack of any guiding principle of law prior to the *Keith* decision also supports the conclusion that *Keith* did not constitute an abrupt break with prior precedence but, merely set forth, for the first time, what had previously been the unstated law.[25] *See Forsyth v. Kleindienst,* Civil

Court, 444 F.2d 651 (6th Cir. 1971), aff'd 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (judicial approval required prior to conducting electronic surveillance for domestic threat to national security); *United States v. Hilliard,* Cr.No. 69–181 (N.D.Calif. May 4, 1971) (warrant required prior to surveillance for domestic security purposes); *United States v. Donghi,* Cr.No. 1970–81 (W.D.N.Y. May 14, 1971) (warrant required prior to surveillance for domestic security purposes); *United States v. Hershkovitz,* 71 Cr. 399 E.L.P. (S.D.N.Y. Sept. 14, 1971) (noted distinction between warrant requirement for surveillance of domestic or foreign threats to national security); *United States v. Hoffman,* 334 F.Supp. 504 (D.D.C.1971) (warrantless surveillance of domestic security threat illegal). The cases generally distinguished between threats emanating from domestic sources and those emanating from foreign sources. The Supreme Court's decision in *Keith* requires prior judicial approval only in the context of electronic surveillance for purposes of gathering information pertaining to threats to the nation's security emanating from domestic sources. The question of the fourth amendment's application to surveillance conducted pursuant to the Executive's foreign affairs power was left undecided. *But cf. United States v. Butenko,* 494 F.2d 593 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974).

**24.** Justice Douglas in a concurring opinion with Justice Brennan, expressed the opinion that the fourth amendment required prior judicial approval for electronic surveillance even when conducted for national security purposes. *Katz, supra* at 359–360, 88 S.Ct. 507. Justice White on the other hand, felt that the warrant procedure was not mandated when the President and the Attorney General determine that a national security threat exists and that electronic surveillance is reasonable. *Id.* at 364, 88 S.Ct. 507.

**25.** The Supreme Court in *Hanover Shoe v. United Shoe Mach.,* 392 U.S. 481, 497–499, 88 S.Ct. 2224, 2233–2334, 20 L.Ed.2d 1231 (1967), a case dealing with the retroactive application of the decision in *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), which had held that proof of predatory practices was not essential to a claim of monopolization in violation of § 2 of the Sherman Act, described a situation not dissimilar to the case *sub judice.* The Court used the following language in applying the holding in *American Tobacco* retroactively:

In the *American Tobacco* case, this court noted that the precise question before it had not been previously decided, 328 U.S., at 811 [66 S.Ct., at 1128], and gave no indication that it thought it was adopting a radically new interpretation of the Sherman Act. Like the Court of Appeals, this Court relied for its conclusion upon existing authorities. These cases [*American Tobacco* and the Second Circuit Court of Appeals decision in *United States v. Aluminum Co. of America,* 148 F.2d 416 (1945)] make it clear that there was no accepted interpretation of the Sherman Act which conditioned a finding of monopolization under § 2 upon a showing of predatory practices by the monopolist. In neither case was there such an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older

No. 72–1920, 447 F.Supp. 192 (E.D.Pa.1978) (Broderick, J.).

■ I need not, however, necessarily reach the question of retroactivity. Assuming *arguendo* that *Keith* is limited to prospective application only, I would have to then decide whether, absent the controlling principle enunciated in *Keith,* the fourth amendment required the Attorney General to secure judicial approval prior to conducting the surveillance in question despite its alleged national security purpose. Because, I believe, for the reasons to follow, that the fourth amendment required that a warrant be secured in this instance, I will refrain from deciding the difficult question of retroactivity posed by the subsequent decision in *Keith.*[26]

The fourth amendment provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

There is no question that the electronic surveillance in this case constituted a search and seizure of the private telephone conversations of these plaintiffs. *Katz, supra.* As such this surveillance conducted without a warrant was *per se* unreasonable and in violation of the dictates of the fourth amendment.[27] *Coolidge v. New Hampshire,* 403 U.S. 443, 454–455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1970).

The failure to procure a warrant, fatal in most instances, is, however, permissible in certain carefully delineated circumstances. Where the search is conducted incident to a lawful arrest, the failure to first secure a warrant is not violative of the fourth amendment. *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The warrantless search of a vehicle is likewise permissible under certain circumstances. *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975) (per curiam); *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 225, 24 L.Ed.2d 177 (1970); *Cooper v. California,*

one. Whatever development in antitrust law was brought about was based to a great extent on existing authorities and was an extension of doctrines which had been growing and developing over the years. These cases did not constitute a sharp break in the line of earlier authority or an avulsive change which caused the current of the law thereafter to flow between new banks. We cannot say that prior to those cases potential antitrust defendants would have been justified in thinking that then current antitrust doctrines permitted them to do all acts conducive to the creation or maintenance of a monopoly, so long as they avoided direct exclusion of competitors or other predatory acts. (footnotes omitted).

**26.** The primary question in dealing with the retroactive application of a particular principle of law is whether the parties were or were not justified in relying upon the prior state of the law. *See Kacher v. Pittsburgh National Bank,* 545 F.2d 842, 847–853 (3d Cir. 1976) (Gibbons, J. dissenting). This question becomes somewhat more complicated in the context of a civil rights damage action against government offi-

cials because of the presence of the qualified immunity defense which likewise raises the issue of justifiable reliance. Although a decision on the retroactivity issue does not necessarily foreclose a determination on the immunity question, the two are clearly interdependent. The question of justifiable reliance involves factual considerations which may be more appropriately resolved after a full evidentiary hearing. Moreover, the retroactivity question need not be resolved in light of the fact that an analysis of the relevant fourth amendment caselaw leads me to the conclusion that a warrant was required in this instance aside from the Supreme Court's subsequent pronouncements in *Keith.*

**27.** Aside from the warrant requirement, the fourth amendment also requires that even warranted search and seizures be conducted in a reasonable manner. *Berger, supra.* The question of the reasonableness of the manner in which this particular surveillance was conducted is discussed in Part II, C, of this opinion.

386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); *Preston v. United States,* 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

In the presence of certain exigent circumstances, a warrant is not required. For example, where the officers are in hot pursuit of a fleeing felon. *United States v. Santana, supra; Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); or where the goods seized were in the process of being destroyed or are of the type that are easily disposed of, *Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1972); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed.2d 59 (1951); *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed.2d 153 (1948); or where the goods were about to be or easily could be removed from the jurisdiction, *Chapman v. United States, supra; Johnson v. United States, supra; United States v. Jeffers, supra.*

A warrantless search of an automobile is permissible if done for the purpose of inventorying its contents. *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Cooper v. California, supra.* Contraband and other evidence may be seized without a warrant when it is within the plain view of an officer legally in its presence. *Coolidge v. New Hampshire, supra; Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). And, of course, a warrantless search and seizure is permitted when it is conducted pursuant to constitutionally valid consent. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

In addition, under certain recognized circumstances, limited searches are permitted without the need to first secure prior judicial approval. An officer may conduct a limited search or "frisk" for the purpose of discovering concealed weapons where he has reason to suspect the individual is involved in criminal activity and he has reason to believe the individual is armed. *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Limited warrantless searches based on less than probable cause are also permitted for the purpose of protecting the nation's borders. *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 46 L.Ed.2d 623 (1975); *United States v. Peltier,* 422 U.S. 531 (1975); *Bowen v. United States,* 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975); *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

Although none of these exceptions are directly applicable to the circumstances of this case, an analysis of the evolution of this body of caselaw suggests the appropriate analytical framework for determining whether an exception should be permitted under the facts of this case. In each case in which the Court has recognized an exception to the warrant requirement, the analysis employed involved a balancing of the relevant interests and a determination that the individual's right of privacy protected by the fourth amendment was outweighed by the public's interest in allowing the search and seizure to be conducted without the prior approval of an impartial magistrate. A review of the court's rationale justifying these exceptions points out the distinction between those cases and the present case.

Recognition of the paramount importance of protecting the police officer's safety and preventing the destruction of evidence was the persuasive factor underlying the contemporaneous search incident to a lawful arrest, stop and frisk and exigent circumstances exceptions. These factors coupled

with the lesser expectation of privacy rationale constitute the basis for the vehicle search exception. The need to protect officials acting in a reasonable and normal manner from civil liability provides the basis for the inventory search exception. The plain view and consent exceptions are derived from the common sense observations that something left in the open to public view is not intended to be kept private and that the search of an area to which the possessor has consented is no longer violative of that person's expectation of privacy. Finally, the justification for the border search exception is the national interest in protecting our borders from the entry of illegal aliens, contraband and other customs violations and recognition of the fact that the delay in securing a search warrant, if required, would so hamper that purpose that a limited administrative type search is permitted without a warrant.

It is evident that in following a balancing approach the Court has given great weight to the necessity in certain circumstances for immediate official action either to protect the officer's safety, prevent the destruction of evidence or because other exigencies of the particular situation requires the officer to act "now or never." *Roaden v. Kentucky, supra* 413 U.S. at 505, 93 S.Ct. 2796. At the same time the Court has been reluctant to extend these exceptions beyond those cases where the government is able to show that immediate action was absolutely necessary. The Court's recognition of the important role that the warrant requirement plays in preserving the individual's rights, as exemplified by the statement in *McDonald v. United States, supra* 335 U.S. at 455–456, 69 S.Ct. at 193, provides the counterbalancing factor in this analytical framework:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

Furthermore, the already difficult burden of showing that the exigencies of the situation made a warrantless search and seizure reasonable under the fourth amendment is perhaps heightened in this case where the thing seized was the plaintiffs' conversations and the ideas expressed therein which in the context of a national security investigation involving political dissidents may well implicate first as well as fourth amendment rights. Quoting from *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), the Court in *Roaden v. Kentucky, supra* 413 U.S. at 504–505, 93 S.Ct. at 2801, involving the warrantless seizure of allegedly obscene films, recognized that first amendment implications may require a more considered analysis of "reasonableness."

> The seizure is unreasonable, not simply because it would have been easy to secure a warrant, but rather because prior restraint of the right of expression . . . calls for a higher hurdle in the evaluation of reasonableness . . .
>
> > "In short, . . . the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for the seizure is the ideas which they contain. No less a

standard could be faithful to First Amendment freedoms. . . . (citations omitted.) [28]

Weighing the interests implicated by this case, the need to conduct a covert investigation of the plaintiffs' actions in order to protect against a perceived threat to the nation's security against the individual's right of privacy as protected by the warrant clause of the fourth amendment, the government has not met the burden necessary to excuse the failure to procure a warrant prior to conducting this surveillance. Armed with the information accumulated by the federal agents, the appropriate authorities could easily have secured a warrant without jeopardizing their own safety or the investigation. There were no exigent circumstances of which I am aware, based on the present record, which would justify the initiation of this surveillance without first taking the necessary steps to protect the plaintiffs' constitutionally mandated rights.

No doubt the interest involved here, that of the nation's security, is of great importance to our citizenry but that alone does not constitute sufficient justification for exempting the plaintiffs' rights from the constitutional protection to which they are entitled. The dangers inherent in allowing even well intentioned executive action to go unchecked solely because it was undertaken in the name of national security were among the primary reasons the founding fathers insisted upon the protections embodied in our constitutional system of checks and balances and more particularly the specific commands of the bill of rights. *See Stanford v. Texas, supra* 379 U.S. at 481–485, 85 S.Ct. 506.

This is not to suggest that there is little merit in the government's concern that disclosure of confidential information to a magistrate in order to secure a warrant might endanger the delicate nature of this type of investigation. Certainly all precautions must be taken to avoid breaching the confidentiality of the investigation and to ensure that the proper judicial officer is sufficiently informed so as to be capable of reaching a determination of probable cause in the context of a national security as compared to a criminal investigation.[29] The fact is, however, that it is precisely in this type of investigation where the interests are significant and the government action necessarily covert that the individual's rights tend to be subverted and must, therefore, be even more scrupulously guarded. Recognition of this fact led Mr. Justice Stewart, in writing for the majority of the Court in *Coolidge v. New Hampshire, supra* 403 U.S. at 454–455, 91 S.Ct. at 2032 to state:

[T]he most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it." In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or "extravagant" to some. But the val-

28. The government also recognizes the importance of protecting oral communications between private individuals. As noted in footnote 4 in *United States v. Chadwick*, 433 U.S. 1, 9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977),

The Government acknowledges that the core values the Fourth Amendment protects are privacy interests. In its view, those privacy interests which should receive the "maximum protection from governmental search

and seizure" provided by the Warrant Clause include private oral and electronic communication . . . Brief for the United States 30.

29. In *Keith* the Court noted that the need for confidentiality and sufficient expertise were important considerations in weighing the need for a warrant but that these concerns could be dealt with without requiring subversion of the individual's fourth amendment rights.

ues were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won—by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important.

(citations omitted).

Following this precept, it is my determination that the government has failed to satisfy the difficult burden of showing that the circumstances under which this search and seizure was conducted requires an exception to the fourth amendment's command that a neutral judicial officer be interposed between the government and the citizen. A warrant was required and the failure to procure one prior to initiating this surveillance violated the plaintiffs' constitutionally protected rights.

### 2. *Title III*

The plaintiffs claim that defendants' actions violated the provisions of Title III in that they failed to comply with the procedures set forth in § 2518 prior to installing these wiretaps. Resolution of this claim depends upon the factual determination of whether national security was the root of this investigation and, as noted in Part II, A of this opinion, that determination must await a full hearing on the merits.

If it is determined that this surveillance was aimed at uncovering criminal activity or for the purpose of political harassment, then the provisions of Title III would clearly be applicable and the defendants' failure to follow the statutorily proscribed procedures would be actionable pursuant to the specific provisions of § 2520 and subject to the statutory immunity defense provided therein.[30] On the other hand, if it is determined that the nation's security was reasonably endangered and this surveillance was aimed at and for the purpose of alleviating that danger, then this wiretap would be outside the purview of Title III because of the explicit disclaimer embodied in § 2511(3).

I am aware of Judge Wright's opinion for the plurality in *Zweibon v. Mitchell, supra* at 663–664 in which it was held that the standards and procedures of Title III apply even to electronic surveillance conducted pursuant to the President's constitutional power to protect this nation from internal subversion. The reasoning of that opinion relies essentially on the "disclaimer" interpretation given to § 2511(3) by the *Keith* decision. As noted above, *Keith* interpreted § 2511(3) as a statement of Congressional neutrality with respect to wiretapping conducted pursuant to whatever constitutional power the President enjoys in carrying out his duty to protect the nation. *Keith*, having determined that the fourth amendment limits even national security investigations, the *Zweibon* Court reasoned that the President has no constitutional power with regard to national security wiretapping and, therefore, the § 2511(3) disclaimer was inoperative.

My reading of the *Keith* decision, however, differs from that of the plurality in *Zweibon*. Initially, the *Keith* Court refuted the government's argument that § 2511(3) conferred or at least recognized the President's power to conduct warrantless electronic surveillance. The Court held that

Section 2511(3) certainly confers no power, as the language is wholly inappropriate for such a purpose. It merely provides that the Act shall not be interpreted to limit or disturb such power as the President may have under the Constitution. In short, Congress simply left presidential powers where it found them.

*Keith, supra* 407 U.S. at 303, 92 S.Ct. at 2130.

After analyzing the context in which § 2511(3) appeared within the statutory scheme of Title III, the Court stated:

---

**30.** See Part I, B of this opinion.

We therefore think the conclusion inescapable that Congress only intended to make clear that the Act simply did not legislate with respect to national security surveillances.

*Id.* at 306, 92 S.Ct. at 2131 (footnote omitted). The Court's consideration of Title III's application to national security surveillances did not end, however, with this conclusion. In the final portion of the opinion, after holding that the fourth amendment limited the President's power to use electronic surveillance as an investigative tool for national security purposes, the Court emphasized that this determination did not necessarily require that executive action in this area comport with Title III's procedures.

> Moreover, we do not hold that the same type of standards and procedures prescribed by Title III are necessarily applicable to this case. We recognize that domestic security surveillance may involve different policy and practical considerations from the surveillance of "ordinary crime." The gathering of security intelligence is often long range and involves the interrelation of various sources and types of information. The exact targets of such surveillance may be more difficult to identify than in surveillance operations against many types of crime specified in Title III. Often, too, the emphasis of domestic intelligence gathering is on the prevention of unlawful activity or the enhancement of the Government's preparedness for some possible future crisis or emergency. Thus, the focus of domestic surveillance may be less precise than that directed against more conventional types of crime.
>
> Given these potential distinctions between Title III criminal surveillances and those involving the domestic security, Congress may wish to consider protective standards for the latter which differ from those already prescribed for specified crimes in Title III. Different standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government for intelligence information

and the protected rights of our citizens. For the warrant application may vary according to the governmental interest to be enforced and the nature of citizen rights deserving protection. . . . It may be that Congress, for example, would judge that the application and affidavit showing probable cause need not follow the exact requirements of § 2518 but should allege other circumstances more appropriate to domestic security cases; that the request for prior court authorization could, in sensitive cases, be made to any member of a specially designated court (*e. g.*, the District Court for the District of Columbia or the Court of Appeals for the District of Columbia Circuit); and that the time and reporting requirements need not be so strict as those in § 2518.

> The above paragraph does not, of course, attempt to guide the congressional judgment but rather to delineate the present scope of our own opinion. We do not attempt to detail the precise standards for domestic security warrants any more than our decision in *Katz* sought to set the refined requirements for the specified criminal surveillances which now constitute Title III.

*Id.* 407 U.S. at 322, 92 S.Ct. at 2139 (citations omitted).

Although the *Zweibon* Court read this language to mean that § 2511(3) was a disclaimer only insofar as the Executive's action was constitutional and that once it was determined that the fourth amendment required a warrant even for national security surveillance, then the full panoply of Title III procedures and remedies became applicable to this type of surveillance. My understanding of *Keith* suggests that the § 2511(3) disclaimer is much broader in scope and excises electronic surveillance for national security purposes completely from the purview of Title III despite the fourth amendment's application. The Court's language in *Keith* appears to be a recognition that the provisions of Title III were tailored to the use of electronic surveillance in the criminal investigation sphere and not the investigation of national security threats.

■ If after a hearing on the merits, it is established that the surveillance in question was conducted for national security purposes pursuant to the President's constitutional duty to protect the nation from such internal threats, then the plaintiffs' statutory claim based on the defendants' admitted failure to comply with the procedures of Title III will be denied on the grounds that § 2511(3), as interpreted by the Supreme Court in *Keith*, exempts such surveillances from the purview of that Act. If, however, the national security predicate is, in fact, nonexistent, as the plaintiffs claim, then the defendants' failure to comply with the standards and procedures set forth in § 2518 would allow the plaintiffs to avail themselves of the specific remedies set forth in § 2520 subject only to the good faith defense specified in that section.

■ The claim against defendants, Saxbe and Kelly, who were admittedly not in any way connected with or responsible for the authorization or effectuation of these wiretaps, is based solely on the allegation that they subsequently used or disclosed the intercepted communications in violation of § 2520 of Title III. The plaintiffs have failed to produce any evidence which would refute the defendants' disclaimer of any disclosure or use of this information outside that required by the criminal litigation generated by the prosecution of those individuals alleged to have been involved in the kidnap plan.[31] (*See* defendants' answers to plaintiffs' interrogatories No. 6(d)(iii)). Defendants, Saxbe and Kelly, having taken office subsequent to the termination of the wiretaps in question and there being no support on the record for plaintiffs' allegations of use and disclosure,[32] I see no basis for holding these defendants liable.

C. *Reasonableness of the Wiretaps*

■ Plaintiffs contend that even if the wiretaps did not require prior court approv-

al, the manner in which they were authorized by the Attorney General, and conducted by the surveillance teams constituted unreasonable searches and seizures under the fourth amendment. Where a warrant is required, but not obtained, the search and seizure is unreasonable *per se*. *Keith, supra* at 314–318, 92 S.Ct. 2125. Even if no warrant was required, the fourth amendment mandates that the search and seizure be reasonable in its execution. The standards upon which to determine whether a search and seizure is conducted in a reasonable manner are best defined in *Berger, supra*. (*See* Part I, B).

The FBI submitted written requests to the Attorney General in order to obtain his approval to conduct the surveillances. These reports, Exhibits B through H attached to defendants' answers to interrogatories, contain what appears to be adequate information to establish the existence of a bona fide threat to national security. The requests, however, are broad in scope without a delineation of precisely what information is to be sought and monitored. The apparent purpose of the proposed surveillances was to obtain broad general information about the activities of the ECCSL and Black Panther Party. The requests state that "valuable information" will "most likely" be obtained. Authorization for the Black Panther tap was granted based upon a report which states:

A telephone surveillance at B.P.P. headquarters in Philadelphia will furnish valuable information concerning the revolutionary activities of the B.P.P. in the United States, particularly in regard to activities in the densely populated metropolitan area surrounding Philadelphia where a number of extremist plots have been initiated in the past.

The Davidon tap was authorized on the basis of a report which states:

Philadelphia and to interested agencies in Philadelphia." This report predated the tenure of Messrs. Saxbe and Kelly, and there is nothing to establish that the information was, in fact, disclosed in accordance with that report.

---

**31.** *See* note 1, *supra*.

**32.** The final sentence in an FBI report attached as Exhibit L to defendants' answers to plaintiffs' interrogatories states that the information would be "disseminated to interested desks in

A telephone surveillance on Davidon's residence will undoubtedly provide extremely valuable information concerning information relating to activities of the ECCSL, as well as information regarding his involvement in the United States. *Defendants' Answers to Interrogatories*, Exhibits B, G.

Neither the requests nor the authorizations appear to restrict the persons whose conversations are to be overheard or the types of conversations that will be monitored. The result is that the authorizations on their face would permit surveillance of any phone calls by any persons on the telephones that were to be tapped.

Both taps were re-authorized for additional periods of time without any substantial showing of necessity. The re-authorization requests merely stated that valuable information has been received concerning the activities of the two organizations, and that it is anticipated that continuing the wiretaps will reveal further information.

In a wiretap conducted for purposes of protecting national security, the type of conversations to be overheard may be far more difficult to precisely define and limit in advance of the actual surveillance than in a criminal investigation. Nevertheless, the "reasonableness" requirement of the fourth amendment is applicable.

In the present case the authorizations may have been overly broad. The issue, however, must depend on the facts concerning the manner in which the surveillance was actually conducted. If, in executing the surveillances, the conversations overheard and recorded were limited to what appeared to relate to national security

threats and were promptly terminated when apparently unrelated conversations were involved, and if the surveillances were otherwise conducted in a manner that was reasonable, then, irrespective of the broad authorizations, the plaintiffs' fourth amendment rights would not be violated.

The record discloses a number of disputed facts as to the manner in which the wiretaps were conducted. Although the logs reveal the content of the overheard conversations, the ultimate issue of reasonableness must resolve upon a consideration of all the relevant then existing circumstances. A decision by way of summary judgment would not be proper. An evidentiary hearing to develop, weigh and analyze all of the facts is essential. The cross motions for summary judgment as to the defendant, John Mitchell, and the officers who conducted the wiretaps will be denied to the extent that this factual issue remains unresolved.

D. *Immunity*

 The defendants have also asserted the defense of official immunity as a bar to any liability for conducting these warrantless wiretaps. To enjoy the defense of qualified immunity [33] the defendants must establish, by a preponderance of the evidence, that (1) they did not know and reasonably need not have known that overhearing the plaintiffs' conversations through the use of a wiretap installed for national security purposes, without first securing a warrant, violated the fourth amendment, and (2) they acted without malicious intention to (a) deprive the plaintiffs of their constitutional rights or (b) cause them to suffer other injury. *Skehan v.*

---

**33.** The defendants have requested reconsideration of the decision in the prior opinion in this case, which held that only qualified as opposed to absolute immunity was available to federal officials who acted in violation of the plaintiff's civil rights. Defendants argue that application of *Scheurer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) which established only qualified immunity for state executive officials violating civil rights, was improper because defendants in

this case were federal officials. I decline to reconsider my earlier decision with the one addendum that the policy enhanced by qualified rather than absolute immunity of executive officials who act in such a manner as to violate constitutionally protected rights would seem to be the same for federal as well as state officials. *See Thompson v. Burke*, 556 F.2d 231, 238 (3d Cir. 1977); *Brawer v. Horowitz*, 535 F.2d 830, 834 (3d Cir. 1976); *Paton v. La Prade*, 524 F.2d 862, 872 (3d Cir. 1975); Note, 50 *Temp.L.Q.* 191 (1976).

Board of Trustees, 538 F.2d 53, 62 (3d Cir.) (en banc), cert. denied, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976).

The opinion in Skehan, supra, suggested and later cases have recognized that the presence or absence of a qualified, good faith immunity depends upon factual considerations and should be determined on the basis of evidence adduced at trial rather than on a motion for summary judgment. See Kacher v. Pittsburgh National Bank, 545 F.2d 842, 853 (3d Cir. 1976) (Gibbons, J. dissenting); Forsyth v. Kleindienst, supra. Recently, however, the Supreme Court reviewed the scope of this affirmative defense as it was developed in Scheurer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and held that state prison officials were entitled to a qualified immunity as a matter of law in a suit brought by a state prisoner pursuant to 42 U.S.C. § 1983 for the alleged violation of his civil rights as a result of the defendant's interfering with his mail. Procunier v. Navarette, —— U.S. ——, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). The basis for this holding, as stated by the Court, was that

whether the state of the law is evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court, there was no "clearly established" First and Fourteenth Amendment right with respect to the correspondence of convicted prisoners in 1971–1972.[34] As a matter of law, therefore, there was no basis for rejecting the immunity defense on the ground that petitioners knew or should have known that their alleged conduct violated a constitutional right. Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, petitioners did not act with such disregard for the established law that their conduct "cannot reasonably be char-

acterized as in good faith." Wood v. Strickland, supra, 420 U.S., at 322, 95 S.Ct., at 1001.

Id. 98 S.Ct. at 861 (footnotes omitted).

Procunier is distinguishable from the present case. This case is concerned with the fourth amendment's warrant requirement which the decision in Katz "clearly established" as applicable to wiretapping conducted by government officials. Whether the defendants in good faith believed that national security wiretapping remained exempt from the warrant requirement of the fourth amendment and whether that belief was reasonable, at the time, in light of footnote 23 in the Katz decision, the proviso in § 2511(3) of Title III and the practices of prior administrations are factual questions which as noted by the Court in Skehan, supra at 62, will require, inter alia,

[an inquiry] into the status and responsibility of each individual defendant and [a determination as to] the same level of knowledge of constitutional rights [to which the defendants should be held responsible]  .   .   . as well as the relative certainty of the legal issue  .   .   .

all of which must be adjudged in light of the circumstances surrounding this particular surveillance.[35] Thompson v. Burke, supra at 236.

Additionally, the Court in Procunier, supra —— U.S., at ——, 98 S.Ct., at 856, also held that the defendants should not be denied the immunity defense under the second branch of the Wood v. Strickland, supra, standard which permits liability where the official acts with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." The Court noted that the complaint in Procunier claimed only "negligent" interference with plaintiffs' mail and therefore there was no basis for denying defendants immunity on the grounds that they acted to "intentional-

---

**34.** The plaintiff claimed that the interference with his outgoing mail occurred between September 1, 1971 and December 11, 1972.

**35.** The question is a difficult one which to a great extent will depend on the actual perceptions of the defendants at the time as to the

legality of their actions weighed in light of the degree to which the law in this area was unsettled and taking into consideration the fact that defendants were the chief law enforcement officer of the United States and his agents.

ly injure" plaintiffs' civil rights. The present case, however, encompasses a claim that defendants acted in bad faith for the purpose of political harassment and with the intention of violating plaintiffs' first and fourth amendment rights. If plaintiffs are able to substantiate this claim after a full hearing on the merits, the defendants' assertion of immunity would be defeated.

### III.

*Conclusion*

The cross-motions for summary judgment will be denied because it appears that certain material factual issues are genuinely disputed. A full evidentiary hearing will be required to determine (1) whether the wiretaps in question were conducted for national security purposes or solely for the purpose of investigating criminal or political activity; (2) whether, even if conducted for national security purposes, the defendants are immune from any liability for their failure to secure a warrant in compliance with the fourth amendment and (3) whether, in any event, this surveillance was conducted in a reasonable manner under the fourth amendment as interpreted in *Berger v. New York, supra.*

United States District Court, M. D. Pennsylvania.